## GAFFNEY v. CUMMINGS et al.

No. 71–1476.  Argued February 26–27, 1973—Decided June 18, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 772.

*Robert G. Dixon, Jr.,* argued the cause for appellant. With him on the briefs were *Harry W. Hultgren, Jr., Francis J. McCarthy,* and *Gordon W. Hatheway, Jr.*

*Robert A. Satter* argued the cause for appellees. With him on the brief was *James A. Wade.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The questions in this case are whether the population variations among the election districts provided by a reapportionment plan for the Connecticut General Assembly, proposed in 1971, made out a prima facie

case of invidious discrimination under the Equal Protection Clause and whether an otherwise acceptable reapportionment plan is constitutionally vulnerable where its purpose is to provide districts that would achieve "political fairness" between the political parties.

## I

The reapportionment plan for the Connecticut General Assembly became law when published by Connecticut's Secretary of State in December 1971. Under the State's Constitution, the legislature is given the initial opportunity to reapportion itself in the months immediately following the completion of a decennial census of the United States. Conn. Const., Art. III, § 6 (b). In the present case, the legislature was unable to agree on a plan by the state constitutional deadline of April 1, 1971. The task was therefore transferred, as required by the constitution, to an eight-member bipartisan commission. *Ibid.* The Democratic and Republican Party leaders in the legislature each appointed four commissioners. The commission was given until July 1, 1971, to devise a reapportionment plan, *id.,* § 6 (c); but, although the commission approached agreement, it too was unable to adopt a plan within the deadline. Accordingly, as a final step in the constitutional process, a three-man bipartisan Board was constituted. *Id.,* § 6 (d). The Speaker of the House of Representatives, a Democrat, and the Republican Minority Leader of the House each chose a judge of the State Superior Court to be a Board member, and the two judges in turn designated a third Board member, who was a justice of the State Supreme Court. *Ibid.*

This Apportionment Board, using the census data available during the summer of 1971, and relying heavily on the legislative commission's tentative plans, filed a

reapportionment plan on September 30, 1971, with one member dissenting.

According to the 1970 census data before the Board, the population of Connecticut is 3,032,217. The Board's reapportionment plan provides for a Senate consisting of 36 senators elected from single-member districts. The ideal senatorial district, in terms of population, would thus contain 84,228 people. The districts actually created deviate, on the average, by 0.45% from this ideal, the median deviation being 0.47%. The largest and smallest senatorial districts deviate by +0.88% and —0.93%, respectively, making the total maximum deviation 1.81%.[1]

The reapportionment plan proposed a House of 151 single-member districts. The population of the ideal assembly district would be 20,081. The average deviation from perfect equality for all the plan's assembly districts is 1.9%, the median deviation, 1.8%. The maximum deviation from the ideal is +3.93% and —3.9%. The maximum deviation between any two districts thus totals 7.83%.[2]

In Connecticut, towns rather than counties are the basic unit of local government. See *Butterworth* v. *Dempsey,* 229 F. Supp. 754, 761 (Conn.), aff'd, 378 U. S. 564 (1964). The State Constitution provides that "no town shall be divided" for the purpose of creating House districts, except where districts are formed "wholly within the town." Art. III, § 4. No comparable directive exists for the creation of Senate districts. The Constitution further provides, however, that the "establishment of districts . . . shall be consistent with federal

---

[1] The ratio of the largest Senate district to the smallest is 1.018 to 1.

[2] The ratio of the largest assembly district to the smallest is 1.082 to 1.

constitutional standards." *Id.*, § 5. To meet those standards and to reach what it thought to be substantial population equality, the Board cut the boundary lines of 47 of the State's 169 towns.[3] The Board also consciously and overtly adopted and followed a policy of "political fairness," which aimed at a rough scheme of proportional representation of the two major political parties. Senate and House districts were structured so that the composition of both Houses would reflect "as closely as possible . . . the actual [statewide] plurality of vote on the House or Senate lines in a given election." [4] Rather than focusing on party membership in the respective districts, the Board took into account the party voting results in the preceding three statewide elections, and, on that basis, created what was thought to be a proportionate number of Republican and Democratic legislative seats.

In November 1971, not long after the Board filed the reapportionment plan with the Secretary of the State, an action was brought in federal district court seeking declaratory and injunctive relief against implementation of the plan. The complaint alleged that the Board "erroneously applied the one man-one vote doctrine of the Fourteenth Amendment . . . to achieve smaller deviations from population equality for the assembly dis-

---

[3] Some town boundaries were cut more than once, resulting in what the parties have termed "town segments," or portions of a town that were used to form an assembly district not wholly within that town. The Board's plan creates 78 such segments in the formation of the 151 assembly districts.

[4] Testimony of Judge George A. Saden, the Republican Board member. App. 264. According to Mr. James F. Collins, a staff member of the Board, the plan for the House resulted in approximately 70 safe Democratic seats, 55 to 60 safe Republican seats, with the balance characterized as probable or swing Democratic or Republican or "just plain swing," 341 F. Supp. 139, 147. See App. 126–127.

tricts than was required by the Fourteenth Amendment . . . and thereby was compelled to segment an excessive number of towns in forming assembly districts." The complaint further alleged the plan amounted to a political gerrymander and contained "a built-in bias in favor of the Republican Party." Appellant Gaffney, the Chairman of the State Republican Party, was permitted to intervene in support of the Board's plan and, after a three-judge court was empaneled, the court heard testimony in March 1972. At the hearing, plaintiff-appellees introduced three alternative House apportionment plans that required fewer town-line cuts, although all three plans involved total deviations from population equality in excess of those contained in the Board plan.[5] A fourth plan for the House was submitted with a total maximum deviation from population equality among districts of 2.61%, as compared with the Board plan, which contained a 7.83% total maximum deviation. This alternative plan, however, was prepared without regard for town lines, which were cut substantially more times than in the Board plan.[6] Considerable evidence was introduced demonstrating the obvious political considerations in the Board's district making.[7] In late March, the District Court filed its decision invalidating the Board plan and permanently enjoining its use in future elections. 341 F. Supp. 139. The court held that "the deviations

---

[5] The Board's Senate plan was not challenged in the District Court and no alternative Senate plan was introduced. Appellees do not challenge the Senate districts on the ground of their population deviations. Brief for Appellees 14 n. 4; Tr. of Oral Arg. 20.

[6] Plaintiff-appellees' plan resulted in 58 town-line cuts and 88 town segments, as opposed to the corresponding figures of 47 and 78 in the Board's plan.

[7] Plaintiff-appellees further offered testimony illustrating the undesirability—in the context of the State's administrative apparatus—of excessive cutting of town lines.

from equality of populations of the Senate and House districts are not justified by any sufficient state interest and that the Plan denies equal protection of the law to voters in the districts of greater population . . . ." *Id.,* at 148. The court relied in part on *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969). More particularly, the court found that the policy of "partisan political structuring," 341 F. Supp., at 150, "cannot be approved as a legitimate reason for violating the requirement of numerical equality of population in districting." *Id.,* at 149. The court therefore required that a plan reflecting "closer adherence to the constitutional guidelines" be adopted. Jurisdiction over the case was retained for all purposes, and the court announced that it "will appoint a master . . . to devise a plan conforming to federal and state constitutional requirements . . . ." *Id.,* at 150.

On June 12, 1972, after a motion to expedite consideration of the appeal had been denied (406 U. S. 942), this Court granted appellant's motion for a stay of the District Court's judgment. 407 U. S. 902. On the basis of that stay, and a subsequent supportive state order,[8] the 1972 fall elections for the State Assembly were held under the Board's reapportionment plan. When this Court convened in October 1972, we noted probable jurisdiction over the appeal. 409 U. S. 839. By this time, a Special Master had been appointed by the District Court and had prepared a reapportionment plan.

## II

We think that appellees' showing of numerical deviations from population equality among the Senate and

---

[8] The order was entered in a parallel state proceeding, *Miller* v. *Schaffer,* No. 173606, Super. Ct., Hartford County, filed November 12, 1971, which was directed at correcting certain clerical errors or omissions in the Board's plan.

House districts in this case failed to make out a prima facie violation of the Equal Protection Clause of the Fourteenth Amendment, whether those deviations are considered alone or in combination with the additional fact that another plan could be conceived with lower deviations among the State's legislative districts. Put another way, the allegations and proof of population deviations among the districts fail in size and quality to amount to an invidious discrimination under the Fourteenth Amendment which would entitle appellees to relief, absent some countervailing showing by the State.

The requirement of Art. I, § 2, of the Constitution, that representatives be chosen "by the People of the several States," mandates that "one man's vote in a congressional election is to be worth as much as another's." *Wesberry* v. *Sanders*, 376 U. S. 1, 8 (1964) (footnote omitted). This standard "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Kirkpatrick* v. *Preisler*, 394 U. S., at 531. In *Kirkpatrick* and in *Wells* v. *Rockefeller*, 394 U. S. 542 (1969), the Court found inconsistent with this standard state statutes creating congressional districts having total maximum deviations of 5.97% and 13.1%, respectively. It is the standard of these cases which is the prevailing rule under Art. I and which we confirm in *White* v. *Weiser, post,* p. 783, today, for the purposes of congressional reapportionment.

Earlier this Term, the question arose whether the same standard is applicable when reviewing state legislative reapportionments under the Equal Protection Clause of the Fourteenth Amendment. *Mahan* v. *Howell,* 410 U. S. 315 (1973). We concluded that there are fundamental differences between congressional districting under Art. I and the *Wesberry* line of cases on the one hand, and, on the other, state legislative reappor-

tionments governed by the Fourteenth Amendment and *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and its progeny. Noting that the "dichotomy between the two lines of cases has consistently been maintained," 410 U. S., at 322, we concluded that "the constitutionality of Virginia's legislative redistricting plan was not to be judged by the more stringent standards that *Kirkpatrick* and *Wells* make applicable to congressional reapportionment, but instead by the equal protection test enunciated in *Reynolds* v. *Sims,*" *id.,* at 324, that test being that districts in state reapportionments be "as nearly of equal population as is practicable," *Reynolds, supra,* at 577, and that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." *Id.,* at 579. In *Mahan,* the ideal district was 46,485 persons per delegate. The maximum variation from the ideal was 16.4%—"the 12th district being overrepresented by 6.8% and the 16th district being underrepresented by 9.6%." 410 U. S., at 319 (footnote omitted). The average percentage variation under the plan was ±3.89%. Of the 52 house districts, 35 were within 4% of the ideal district, and nine, exceeded a 6% variation from the ideal.

The asserted justification for the divergencies in *Mahan* was "the State's policy of maintaining the integrity of political subdivision lines," *id.,* at 325, a policy we found to be rational and wholly sufficient to justify the district population disparities of the size and quality that had been found to exist. We ruled that the "relatively minor variations present in the Virginia plan contrast sharply with the larger variations in state legislative reapportionment plans that have been struck

down by previous decisions of this Court," *id.*, at 329, and that "Virginia has not sacrificed substantial equality to justifiable deviations." *Ibid.*

Although requiring that the population variations among legislative districts in *Mahan* be justified by substantial state considerations, we did not hold that in state legislative cases any deviations from perfect population equality in the districts, however small, make out prima facie equal protection violations and require that the contested reapportionments be struck down absent adequate state justification. Nor had we so held in any prior state reapportionment case. *Swann* v. *Adams,* 385 U. S. 440 (1967), and *Kilgarlin* v. *Hill,* 386 U. S. 120 (1967), required state justification of population variations found in state legislative reapportionments, but the variations involved in each of these cases exceeded those we dealt with in *Mahan.*

In the case now before us, appellant urges that the population variations among Senate and House districts in the Board plan did not in and of themselves demonstrate an equal protection violation and that the State was not required to justify them, absent further proof of invidiousness by appellees. For several reasons we think the point is well taken and that the District Court erred in holding to the contrary.

As we noted in *Mahan* v. *Howell, Reynolds* v. *Sims* recognized that a State must make an honest and good-faith effort to construct its districts "as nearly of equal population as is practicable," but that absolute equality was a "practical impossibility": "Mathematical exactness or precision is hardly a workable constitutional requirement." 377 U. S., at 577. Moreover, the *Reynolds* court also noted that "some distinctions may well be made between congressional and state legislative representation," and that "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to

state legislative apportionment than in congressional districting." *Id.*, at 578. All that would be required was "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.*, at 579. In other words, "[s]imply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.*, at 568.

As these pronouncements have been worked out in our cases, it has become apparent that the larger variations from substantial equality are too great to be justified by any state interest so far suggested. There were thus the enormous variations struck down in the early cases beginning with *Reynolds* v. *Sims*,[9] as well as the much smaller, but nevertheless unacceptable deviations, appearing in later cases such as *Swann* v. *Adams*, 385 U. S. 440 (1967); *Kilgarlin* v. *Hill*, 386 U. S. 120 (1967); and *Whitcomb* v. *Chavis*, 403 U. S. 124, 161–163 (1971).

---

[9] *Reynolds* v. *Sims* involved the Alabama State Legislature, which had not reapportioned itself in over 60 years. Under the apportionment existing in 1964, some senatorial districts with the same number of representatives had over 40 times more people than others. House districts with identical representation could vary by 16 to 1. In Maryland in 1964, some House districts with nominally equal representation could have six times more people than others, while senatorial districts could be 32 times larger than others. *Maryland Committee for Fair Representation* v. *Tawes*, 377 U. S. 656 (1964). The list may easily be expanded to include other States, and Connecticut is no exception. In 1964, the Connecticut towns of Hartford and Union had the same representation in the House, but Union had a population of 383 people, while Hartford had a population of 162,178. A vote in Union was thus weighted about 425 times more heavily than a vote in Hartford. At that time, it would have taken only 11.9% of Connecticut's population to elect a majority of its House, and only 31% to elect a Senate majority. See *Butterworth* v. *Dempsey*, 229 F. Supp. 754 (Conn.), aff'd, 378 U. S. 564 (1964).

On the other hand, as *Mahan* v. *Howell* demonstrates, population deviations among districts may be sufficiently large to require justification but nonetheless be justifiable and legally sustainable. It is now time to recognize, in the context of the eminently reasonable approach of *Reynolds* v. *Sims*, that minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.

We doubt that *Reynolds* would mandate any other result, if for no other reason than that the basic statistical materials which legislatures and courts usually have to work with are the results of the United States census taken at 10-year intervals and published as soon as possible after the beginning of each decade. These figures may be as accurate as such immense undertakings can be, but they are inherently less than absolutely accurate. Those who know about such things recognize this fact,[10] and, unless they are to be wholly ignored, it makes little sense

---

[10] See, *e. g.*, H. Alterman, Counting People: The Census in History 262 (1969):

"A census, by its nature, can never be an exact count of a nation. This is especially true of the United States . . . . Thus, an error of 1 or 2 percent in the count of the total population is to be expected; professionally, it is regarded as an 'acceptable' error."

The Census Bureau estimates that the 1970 census had an undercoverage rate of 2.5%, or about 5,300,000 people. Address of J. S. Siegel, Population Association of America Annual Meeting, in New Orleans, La., Apr. 26, 1973. See N. Y. Times, Apr. 26, 1973, p. 1, col. 1.

Inexactness of census data is most evident with respect to minorities. It is estimated, for example, that Negroes were underenumerated in the 1970 census by 7.7%, as compared to an estimated 1.9% undercount for white persons. *Ibid.* See also Siegel, Completeness of Coverage of the Nonwhite Population in the 1960 Census and Current Estimates, and Some Implications, in Social Statistics and the City 13 (D. Heer ed. 1968).

to conclude from relatively minor "census population" variations among legislative districts that any person's vote is being substantially diluted. The "population" of a legislative district is just not that knowable to be used for such refined judgments.

What is more, it must be recognized that total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena.[11] So, too, if it is the weight of a person's vote that matters, total population—even if stable and accurately taken—may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because "census persons" are not voters.[12] The proportion of the census

---

[11] See, e. g., M. Spiegelman, Introduction to Demography 415–416 (1968); U. S. Bureau of the Census, 2 The Materials and Methods of Demography 806 (1971).

In Connecticut, for example, the population of the State as a whole grew by 19.6% during the 1960's. But the population in the area comprising the Second Congressional District grew by over 28%, while the population in the Fourth District grew by only 11.2%. The U. S. Bureau of the Census, Congressional District Data Book, 93d Congress, Connecticut 7 (1972).

[12] See Burns v. Richardson, 384 U. S. 73, 91–92 (1966):

"We start with the proposition that the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. . . . Neither in Reynolds v. Sims nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or tem-

population too young to vote or disqualified by alienage or nonresidence varies substantially among the States and among localities within the States. The six congressional districts in Connecticut, for example, vary from one another by as much as 4% in their age-eligible voters, with the first district having 68% of its census population at voting age while the sixth district has 64% at 18 years or older. Bureau of the Census, Congressional District Data Book, 93d Congress, Connecticut 7–8 (1972). Other States have congressional districts that vary from one another by as much as 29% and as little as 1% with respect to their age-eligible voters.[13] And these figures tell us nothing of the other ineligibles making up the substantially equal census populations among election districts: aliens, nonresident military personnel, nonresident students, for example. See *Burns* v. *Richardson,* 384 U. S. 73, 90–97 (1966); *Davis* v. *Mann,* 377 U. S. 678, 691–692 (1964); *Ely* v. *Klahr,* 403 U. S. 108, 115–116, n. 7 (1971); *Mahan* v. *Howell,* 410 U. S., at 330–332. Nor do these figures tell anything at all about the proportion of all those otherwise eligible in-

porary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere. Unless a choice is one the Constitution forbids, cf., *e. g., Carrington* v. *Rash,* 380 U. S. 89, the resulting apportionment base offends no constitutional bar, and compliance with the rule established in *Reynolds* v. *Sims* is to be measured thereby."

[13] Utah, Rhode Island, New Hampshire, and Missouri have only 1% variations. New York has a 29% variation in age-eligible voters among its congressional districts, while California has a 25% and Illinois a 20% variation. These figures may be computed from the Bureau of the Census' Congressional District Data, 93d Congress, for the respective States.

dividuals whose vote cannot be counted or weighed because they either failed to register or failed to vote.[14]

*Reynolds* v. *Sims,* of course, dealt with more than the statistical niceties involved in equalizing individual voting strength. It argued that "if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted." 377 U. S., at 562. To conclude differently, "and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result." *Id.,* at 565. More fundamentally, *Reynolds* recognized that "the achieving of fair and effective representation for all citizens is . . . the basic aim of legislative apportionment," *id.,* at 565–566, and it was for that reason that the decision insisted on substantial equality of populations among districts.

This is a vital and worthy goal, but surely its attainment does not in any commonsense way depend upon eliminating the insignificant population variations involved in this case. Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among dis-

---

[14] Again using Connecticut congressional districts as an example, in the November 1972 elections, the percentage of registered voters who actually voted varied by a maximum of 2.8%. See Statement of Vote, General Election Nov. 7, 1972, State of Conn. Pub. Doc. No. 26, p. 72 (1973). The percentages of registered voters who voted varied by as much as about 23% among the towns in the State. *Id.,* at 65–71.

trict populations.[15] There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. See *Mahan* v. *Howell, supra; Abate* v. *Mundt,* 403 U. S. 182 (1971); *Dusch* v. *Davis,* 387 U. S. 112 (1967); *Sailors* v. *Board of Education,* 387 U. S. 105 (1967); *Burns* v. *Richardson, supra.* An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.

Nor is the goal of fair and effective representation furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan. From the very outset, we recognized that the apportionment task, dealing as it must with fundamental "choices about the nature of representation," *Burns* v. *Richardson,* 384 U. S., at 92, is primarily a political and legislative process. *Reynolds* v. *Sims,* 377 U. S., at 586. We doubt that the Fourteenth Amendment requires repeated displacement of otherwise appropriate state decisionmaking in the name of essentially minor deviations from perfect census-population equality that no one, with confidence, can say will deprive any person of fair and effective representation in his state legislature.

That the Court was not deterred by the hazards of the

---

[15] For discussions of the vast and growing literature in this area, see Reapportionment in the 1970s (N. Polsby ed. 1971).

political thicket when it undertook to adjudicate the re-apportionment cases does not mean that it should become bogged down in a vast, intractable apportionment slough, particularly when there is little, if anything, to be accomplished by doing so.

This very case represents what should not happen in the federal courts. The official state functionaries proposed a plan with a maximum variation among the districts of 7.83% in the House and 1.81% in the Senate, and with respective average variations of 1.90% and .45%. Appellees then proposed four alternate plans for the House, three of which involved slightly larger variations among districts but cut fewer town lines. The fourth cut more lines, but had a maximum variation between its largest and smallest district of only 2.6%. The District Court thought the state plan involved unacceptably large variations between districts, although in the House, with districts of about 20,000 people, the average variation involved only 399 people, and the largest variations involved only 1,573 people.[16] But neither did the District Court adopt any of the plans submitted by appellees. Instead, it appointed its own Master to come up with still another scheme. That plan, we are told, involves a total maximum deviation in the House of only 1.16%.[17] Was the Master compelled, as a federal constitutional matter, to come up with a plan with smaller variations than were contained in appellees' plans? And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvements like this must end at some point, but that point constantly recedes if those

[16] Among the Senate districts (of about 84,000 people each), the average deviation involves only about 400 people and the maximum deviation only 1,532 people.

[17] Reply Brief for Appellant 19. Apparently, more refined census data were available to the Master in preparing this later plan.

who litigate need only produce a plan that is marginally "better" when measured against a rigid and unyielding population-equality standard.

The point is, that such involvements should never begin. We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it. Their work should not be invalidated under the Equal Protection Clause when only minor population variations among districts are proved. Here, the proof at trial demonstrated that the House districts under the State Apportionment Board's plan varied in population from one another by a *maximum* of only about 8% and that the average deviation from the ideal House district was only about 2%. The Senate districts had even less variations. On such a showing, we are quite sure that a prima facie case of invidious discrimination under the Fourteenth Amendment was not made out.

## III

State legislative districts may be equal or substantially equal in population and still be vulnerable under the Fourteenth Amendment. A districting statute otherwise acceptable, may be invalid because it fences out a racial group so as to deprive them of their pre-existing municipal vote. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed "to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson* v. *Dorsey,* 379 U. S. 433, 439 (1965). See *White* v. *Regester, post,* p. 755; *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *Abate* v. *Mundt,* 403 U. S., at 184 n. 2; *Burns* v. *Richardson,* 384 U. S., at 88–89. We must, therefore, respond to appellees' claims in this case

that even if acceptable populationwise, the Apportionment Board's plan was invidiously discriminatory because a "political fairness principle" was followed in making up the districts in both the House and Senate.

The record abounds with evidence, and it is frankly admitted by those who prepared the plan, that virtually every Senate and House district line was drawn with the conscious intent to create a districting plan that would achieve a rough approximation of the statewide political strengths of the Democratic and Republican Parties, the only two parties in the State large enough to elect legislators from discernible geographic areas. Appellant insists that the spirit of "political fairness" underlying this plan is not only permissible, but a desirable consideration in laying out districts that otherwise satisfy the population standard of the reapportionment cases. Appellees, on the other hand, label the plan as nothing less than a gigantic political gerrymander, invidiously discriminatory under the Fourteenth Amendment.[18]

We are quite unconvinced that the reapportionment plan offered by the three-member Board violated the Fourteenth Amendment because it attempted to reflect the relative strength of the parties in locating and defining election districts. It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary.

[18] Appellees also maintain that the shapes of the districts would not have been so "indecent" had the Board not attempted to "wiggle and joggle" boundary lines to ferret out pockets of each party's strength. That may well be true, although any plan that attempts to follow Connecticut's "oddly shaped" town lines (App. 98) is bound to contain some irregularly shaped districts. But compactness or attractiveness has never been held to constitute an independent federal constitutional requirement for state legislative districts. Cf. *White* v. *Weiser, post,* p. 783; *Wright* v. *Rockefeller,* 376 U. S. 52, 54 (1964), and *id.,* at 59–61 (DOUGLAS, J., dissenting).

See *White* v. *Regester, supra; Burns* v. *Richardson, supra; Whitcomb* v. *Chavis, supra; Abate* v. *Mundt, supra.* The very essence of districting is to produce a different—a more "politically fair"—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.

It may be suggested that those who redistrict and reapportion should work with census, not political, data and achieve population equality without regard for political impact. But this politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results; and, in any event, it is most unlikely that the political impact of such a plan would remain undiscovered by the time it was proposed or adopted, in which event the results would be both known and, if not changed, intended.

It is much more plausible to assume that those who redistrict and reapportion work with both political and

census data. Within the limits of the population equality standards of the Equal Protection Clause, they seek, through compromise or otherwise, to achieve the political or other ends of the State, its constituents, and its office-holders. What is done in so arranging for elections, or to achieve political ends or allocate political power, is not wholly exempt from judicial scrutiny under the Fourteenth Amendment. As we have indicated, for example, multimember districts may be vulnerable, if racial or political groups have been fenced out of the political process and their voting strength invidiously minimized. See *White* v. *Regester, supra; Whitcomb* v. *Chavis, supra*. See also *Gomillion* v. *Lightfoot, supra*. Beyond this, we have not ventured far or attempted the impossible task of extirpating politics from what are the essentially political processes of the sovereign States. Even more plainly, judicial interest should be at its lowest ebb when a State purports fairly to allocate political power to the parties in accordance with their voting strength and, within quite tolerable limits, succeeds in doing so. There is no doubt that there may be other reapportionment plans for Connecticut that would have different political consequences and that would also be constitutional. Perhaps any of appellees' plans would have fallen into this category, as would the court's, had it propounded one. But neither we nor the district courts have a constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State.

*Reversed.*

[For dissenting opinion of MR. JUSTICE BRENNAN, see *post,* p. 772.]