In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2977

LEAGUE OF WOMEN VOTERS OF
CHICAGO, et al.,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-02455 — **Sharon Johnson Coleman**, *Judge.*

ARGUED APRIL 7, 2014 — DECIDED JULY 9, 2014

Before WOOD, *Chief Judge*, and KANNE and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* In 2012, Chicago's City Council voted on and adopted a new ward map to take effect in 2015. The League of Women Voters of Chicago and fourteen Chicago citizens (collectively "the League") filed this action challenging the redistricting. The League alleged that the 2015 map failed to adhere to equal-population principles established under the Equal Protection Clause of the Fourteenth Amendment. The

League also asserted that the City prematurely implemented the 2015 boundaries, which infringed upon their right to vote under the Fourteenth Amendment. The district court granted the City's 12(b)(6) motion for failure of the League to state a claim. For the following reasons, we affirm.

## I. BACKGROUND

Following the 2010 census, and pursuant to state law, the City of Chicago sought to reapportion its fifty aldermanic wards. 65 ILCS 20/21-36. Beginning in 2011, the City Council conducted hearings to solicit the views of citizens regarding the redrawing of ward boundaries. Under state law, the Council was required to garner the approval of forty-one aldermen in order to prevent a referendum on the redistricting plan. 65 ILCS 20/21-39; 65 ILCS 20/21-40. On January 19, 2012, the Council approved the redistricting plan by a vote of forty-one to eight.

According to the 2010 census, the City's population was 2,695,598, which, if divided equally, would result in 53,912 people in each ward. The wards created by the 2015 map deviate from the average population per ward by a maximum of 8.7 percent.

The League filed this action challenging the redistricting ordinance. Only Counts I and III are at issue in this appeal.[1] In

---

[1]  The League also asserted that the plan unlawfully created classifications of citizens without any rational basis in violation of the Equal Protection Clause of the Fourteenth Amendment. Additionally, the League made state statutory claims, which the district court dismissed without prejudice

(continued...)

Count I, they alleged that the new ordinance was implemented prematurely and deprived constituents of their right to equal protection under the Fourteenth Amendment.

In Count III, the League claimed that the maximum deviations of 8.7 percent between the wards violated the Equal Protection Clause of the Fourteenth Amendment. They alleged that the 2015 map was arbitrary, that it politically discriminated against "independent" aldermen, and that it departed from traditional redistricting criteria. The League also alleged that the Second and Thirty-Sixth Wards were redrawn to a greater degree than others in an attempt to oust the aldermen of these wards who demonstrated political independence from the City Council majority.

Following the City's 12(b)(6) motion, the district court dismissed both Counts I and III for failure to state a claim. As for Count I, the court held that the League had not alleged permanent disenfranchisement nor a change to election law; at most, the League had claimed temporary disenfranchisement, which does not give rise to equal protection concerns. Moreover, the court noted that reacting to the concerns of future constituents is simply part of the political process.

The court also dismissed the equal-population claim, finding that the League failed to meet its burden to show a prima facie case of unconstitutionality. The court, citing *Brown v. Thomson*, 462 U.S. 835, 842 (1983) noted that a maximum

---

[1] (...continued)

because it declined to exercise supplemental jurisdiction. The League does not pursue these claims on appeal.

population deviation below 10 percent is considered minor and insufficient to establish a prima facie case that requires justification by the state. The court further found that the League's complaint did not allege that the map targeted an objectively defined group and preserved the voting rights of minorities. Finally, the court found that disfavoring certain aldermen over others is an inherent part of the political process and an inevitable result of redistricting.

## II. ANALYSIS

### A. Standard of Review

We review a 12(b)(6) dismissal *de novo* and construe all allegations and any reasonable inferences in the light most favorable to the plaintiff. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). And while a complaint does not need "detailed factual allegations" to survive a 12(b)(6) motion to dismiss, it must allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### B. One Person, One Vote

The Equal Protection Clause principle of "one person, one vote" requires that officials be elected from voting districts with substantially equal populations. *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). Thus, "one man's vote in a[n] ... election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964). To achieve this result, the government must "make an honest and good-faith effort to construct its districts as nearly of equal population as is practicable," but mathematical

precision is not required. *Gaffney v. Cummings*, 412 U.S. 735, 743 (1973) (internal quotation marks omitted).

The Supreme Court has held that a maximum population deviation greater than ten percent "creates a prima facie case of discrimination and therefore must be justified by the state." *Brown*, 462 U.S. at 842–43. But when a maximum deviation is less than ten percent, the deviation is considered minor and the plaintiffs cannot "establish a violation of the Equal Protection Clause from population variations alone." *White v. Regester*, 412 U.S. 755, 764 (1973); *see also Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996). Thus, a plan with a minor maximum population deviation will be presumed to be constitutionally valid absent a showing of "arbitrariness or discrimination." *Roman v. Sincock*, 377 U.S. 695, 710 (1964). To overcome the presumption, the League makes three allegations of arbitrariness or discrimination.

### 1. Alderman O'Connor's Statement

First, the League points to a statement made by Alderman Patrick O'Connor who claimed that the map was created in order "to have the largest number of City Council members available so that we would not have a referendum." The League argues that this statement, standing alone, demonstrates that the map was created arbitrarily. Yet this statement suggests nothing of the sort. Alderman O'Connor was simply stating a fact: in order to prevent a referendum from occurring, it was necessary to obtain the proper majority of votes. 65 ILCS 20/21-39; 65 ILCS 20/21-40. One alderman's statement can hardly be said to establish that the whole City Council acted arbitrarily in designing the map. At most, the statement reflects

that Alderman O'Connor wanted this bill to pass into law, a proposition that required a substantial majority of votes.

*2. "Independent" Aldermen*

The League also claimed that the new map—designed by Democratic aldermen—targeted two other Democratic aldermen from the Second and Thirty-Sixth Wards who "have shown political independence from the City Council majority." The League alleged that the City Council majority drew the 2015 map to "oust" these aldermen from their respective districts. Citing Justice Stevens' concurrence in the summary affirmance of *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.) (per curiam), summarily aff'd, 542 U.S. 947 (2004), they argue that political discrimination alone can serve to rebut the presumption of constitutional validity for maps with deviations below ten percent.[2]

*Larios* involved redistricting that was tainted by two prohibited considerations: (1) the redistricting sought "to allow

---

[2] We note that *Larios* did not fully address whether a state body's political motivations may serve to establish an equal-population violation. As the Supreme Court has indicated, "Even in addressing political motivation as a justification for an equal-population violation, ... *Larios* does not give clear guidance. The panel explained it 'need not resolve the issue of whether or when partisan advantage alone may justify deviations in population' because the plans were 'plainly unlawful'" and all political motivations were intertwined with clearly rejected objectives. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423 (2006), citing *Larios*, 300 F. Supp. 2d at 1352. Moreover, a summary affirmance means that the Supreme Court agreed with the judgment "but not necessarily the reasoning by which it was reached." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (quotation omitted).

rural and inner-city Atlanta regions of the state to hold on to their legislative influence" at the expense of Republican-leaning areas; and (2) the deviations "were created to protect incumbents in a wholly inconsistent and discriminatory way." *Larios*, 300 F. Supp. 2d at 1342. But *Larios* is inapplicable.

The district court's concern in *Larios* was that the *voters'* ability to elect their representatives was significantly diminished, not that individual Democratic or Republican representatives were immune from the political process. It noted that voters with particular ideologies were being disfavored: "Republican-leaning districts [were] vastly more overpopulated as a whole than Democratic-leaning districts." *Id.* at 1331. Such is not the case here.

The Constitution "guarantees the opportunity for equal participation by all *voters* in the election of [their representatives]." *Reynolds*, 377 U.S. at 566 (emphasis added). It is not meant to insulate individual politicians from the threat of political reprisal once redistricting occurs. The fact remains that the equal-population requirement is meant to protect "an *individual's* right to vote." *Id.* at 568 (emphasis added).

Redistricting is an inherently political process; indeed, the Supreme Court has noted that "[p]olitics and political considerations are inseparable from districting and apportionment.... The reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney*, 412 U.S. at 753; *see also Larios*, 300 F. Supp. 2d at 1354 ("a redistricting process need not be free of politics in order to be constitutional."). As in any election or redistricting scheme, there are bound to be winners and losers. Simply alleging that two

aldermen—who were of the same party as those seeking to "oust" them—were at the short end of the proverbial stick is not enough to overcome a presumptively constitutional map and establish a prima facie violation of voters' equal protection rights.

### 3. *Traditional Redistricting Criteria*

Finally, the League asserts that the new map departs from traditional redistricting criteria. But, as explained above, the League fails to allege how any of these "grotesque shapes and boundaries" harm voters. The suggestion that a map that is not compact or genuinely contiguous violates equal protection principles simply misstates the law, for "compactness or attractiveness has never been held to constitute an independent federal constitutional requirement." *Gaffney*, 412 U.S. at 752 n. 18.

The use of traditional redistricting criteria is not a basis for an equal-population violation, but rather a *defense* to be used in defending a redistricting decision once the plaintiff has made out a prima facie case. "Any number of consistently applied legislative policies might *justify* some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)(emphasis added); *see Larios*, 300 F. Supp. 2d at 1349–50 (finding that the defendant made no attempt "to *justify* the population deviations because of compactness, contiguity, respecting the boundaries of political subdivisions, or preserving the cores of prior districts." (emphasis added)). The Court continued in *Karcher*, "As long

as the criteria are nondiscriminatory, these are legitimate objectives that on a proper showing could justify minor population deviations." *Id*.(internal citation omitted); *see also Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("traditional districting principles such as compactness, contiguity, and respect for political subdivisions" are "important not because they are constitutionally required—*they are not ...*—but because they are objective factors that may serve to *defeat* a claim that a district has been gerrymandered." (emphasis added)(internal citation omitted)).

The "one person, one vote" principle seeks to prevent one district from becoming so overpopulated, or underpopulated, that it leads to significant disparities in voting strength amongst others. *See Reynolds*, 377 U.S. at 562–564. Whether certain wards appear to be "bizarre or uncouth," as the League alleges, is not enough to establish a prima facie case for an equal protection violation. Rather, had the League made out a prima facie case, the City could use traditional redistricting criteria to show that the deviations are nonetheless constitutional. The League has not done so and therefore their equal protection claim must fail.

*C. Early Implementation*

The League also claims that the City has implemented the new boundaries prematurely, which results in a denial of equal protection under the Fourteenth Amendment. They base this assertion on various letters and statements from individual aldermen to show that the City has enacted a widespread policy of early implementation. And although the complaint admits that the Council "has not expressly approved by

resolution or ordinance the right of City Council members to begin representing [constituents] on the basis of the new ward boundaries[,]" the League nonetheless claims that the City has already put the 2015 plan into practice.

The allegation, although framed otherwise, is essentially a *Monell* claim, seeking to invoke the rule that prohibits municipal agencies from implementing policies that cause constitutional injuries under 42 U.S.C. § 1983.[3] But the City cannot be liable under section 1983 for respondeat superior. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dept. of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). There are only three ways in which a municipality can be held liable under section 1983. There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled that it constitutes a custom or practice ; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007).

The League has conceded that the City has not implemented this change by way of "a formal ordinance or resolution" and has not alleged that any one individual with policy-making authority has caused the deprivation. Accordingly,

---

[3] Though the district court did not address this issue, "we may affirm a judgment on any ground the record supports and the appellee has not waived." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454–55 (7th Cir. 2011).

they must allege a common, unwritten practice put in place by the City that nonetheless has the force of law. They fail to do so. The League relies on a few incidents wherein individual aldermen have taken or refused action based on the 2015 map. But this does not establish an impermissible custom or practice. "Misbehaving employees are responsible for their own conduct; units of local government are responsible only for their policies rather than misconduct by their workers." *Waters v. City of Chi.*, 580 F.3d 575, 581 (7th Cir. 2009). This minimal correspondence by individual aldermen is a far reach from proving a policy "so permanent and well settled as to constitute a custom or usage with the force of law." *Baskin v. City of Des Plaines*, 138 F.3d 701, 704–05 (7th Cir. 1998). Accordingly, the League has failed to allege a violation of their constitutional rights.

### III. CONCLUSION

The League failed to allege any facts that would entitle them to relief under the Equal Protection Clause. For the foregoing reasons, we AFFIRM the district court's decision to dismiss the claims.