In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3463

ROBERT MCCOY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CHICAGO HEIGHTS ELECTION
COMMISSION, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 87 C 5112 and 88 C 9800 — **Robert W. Gettleman**, *Judge.*

ARGUED OCTOBER 30, 2017 — DECIDED JANUARY 22, 2018

Before WOOD, *Chief Judge,* and BAUER and EASTERBROOK,
*Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiffs-appellants Robert McCoy
and Kevin Perkins ("Appellants") appeal from the district
court's order approving as constitutional a reapportioned map
of aldermanic districts in the City of Chicago Heights ("the

City"). The City redrew the ward boundaries pursuant to a consent decree entered in 2010, after decades of litigation. After an evidentiary hearing, the district court ruled that the City had sufficiently justified the population deviations in its proposed map. We affirm.

## I. BACKGROUND

This case began in 1987, when a class of African-American plaintiffs filed suits against the City and the Chicago Heights Park District, alleging dilution of voting opportunity and challenging the methods for electing representatives to the City Council and the Park District Board. We will briefly summarize the relevant facts, but the long history of this litigation has been well documented through numerous written opinions. *See Harper v. City of Chicago Heights*, 223 F.3d 593, 596 (7th Cir. 2000) (summarizing and listing previous decisions).

Early in the litigation, the election practices at issue were found to violate Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1971, *et seq.* (currently cited as 52 U.S.C. § 10101). That finding set in motion an arduous process of attempting to remedy the violation through the establishment of a consent decree, which included a number of appeals and remands. Appellants split from the other class plaintiffs in 1994, and objected to the entry of the first consent decree. Since that time, they have remained as the main opposition to the proposed remedies for the violation.

In November 2010, the district court entered the most recent consent decree ("the Decree"), which, despite its goal of settling all outstanding disputes, forms the basis for this

appeal. The Decree established a seven-ward, single alder-
manic form of government, and included a ward map that
complied with the applicable constitutional requirements. The
Decree also contained a provision requiring the City to
reapportion the wards as the population changed.

After the Decree was entered, the 2010 census results
showed that the wards' populations had changed such that the
map required reapportionment. Accordingly, the City endeav-
ored to redraw the wards to comply with the Decree. On
June 20, 2014, after a public comment process, the City passed
an ordinance approving its redrawn ward map. Then, on
October 22, 2014, the City filed a motion in the district court
seeking approval of its redrawn map as constitutional. Appel-
lants responded, objecting to the City's proposed map and
seeking leave to file their own ward map for approval and
implementation by the court.

As an initial matter, the court held that the Decree did not
allow for Appellants to propose their own ward map. Instead,
it found that the Decree gave the City the exclusive right to
reapportion the wards. Therefore, the court only considered
the City's proposed map.

The City's map still contained seven wards, each with an
individual population deviation of less than ten percent.
However, the overall deviation of the proposed map was
12.65%. Therefore, the court denied without prejudice the
City's motion to approve the new map. The court gave the City
the option of either submitting justification for the deviation or
proposing a new map that would bring the overall deviation
under ten percent. The City elected to submit a supplemental

brief providing its justifications, and the court held an evidentiary hearing to determine whether those were sufficient to support the overall population deviation.

Ultimately, the court found that the City had presented sufficient justification and had made a good faith effort to reapportion the map with the smallest population deviations practicable. It found that the City used legitimate and nondiscriminatory objectives in reapportioning the wards, such as maintaining historical and natural boundary lines where possible, and easing voter confusion by redrawing unusual boundaries. For those reasons, the court held that the City had complied with the Decree, and it approved the City's proposed map as constitutional.

## II.  DISCUSSION

This appeal presents two distinct issues. The first is whether the district court erred in determining that the Decree gave the City the exclusive right to propose a reapportioned ward map. The second is whether the court was correct in determining that the City's proposed map was constitutionally valid. We address each in turn.

### A.  Interpretation of the Decree

A consent decree is a form of contract, the interpretation of which is typically subject to *de novo* review. *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037–38 (7th Cir. 1995). We have recognized an exception to that rule, however, and have given deference to the district court's interpretation where the judge who interprets the decree had involvement in its creation and oversaw the litigation for an extended period of time. *See, e.g.,*

*id.* at 1038; *see also South v. Rowe*, 759 F.2d 610, 613 n.4 (7th Cir. 1985).

This case began more than 30 years ago, but it has been overseen by four different district judges. District Judge Coar had the case for nearly 15 years before approving the Decree in 2010. The case was then reassigned to District Judge Gettleman. Judge Gettleman made the rulings that formed the basis of this appeal, but he did not oversee in the negotiation of the Decree, nor did he approve it. Therefore, we will review Judge Gettleman's interpretation of the Decree *de novo*.

Appellants argue that they were entitled to submit their own map for the court's consideration and approval based on the second to last sentence of the Decree, which states: "After the publication of the 2010 census, the parties will, within reasonable dispatch, reapportion the voting districts, if necessary, in time for the next election following that date." The reference to "the parties," Appellants contend, indicates that both they and the City were allowed to submit maps, and the court was to decide which represented the better remedy.

However, a clause that appears earlier in the Decree, and on which the district court relied for its ruling, contradicts that notion. It states that after the elections scheduled in February and April of 2011, "the Defendants shall reapportion the aldermanic ward boundary lines in accordance with the provisions of Illinois and federal law."

As the Supreme Court has repeatedly made clear, reapportionment of voting districts is, first and foremost, the responsibility of the local government. *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("Time and again, we have emphasized

that reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.") (internal quotation marks and citation omitted); *Wise v. Lipscomb*, 434 U.S. 1329, 1332 (1977) (citing cases that indicate "municipal election plans are entitled to the same respect accorded those of state legislatures"). Typically, a federal court should not involve itself in the reapportionment process unless the governing body fails to put forth a plan that complies with constitutional requirements. *Wise*, 434 U.S. at 1331–32 (explaining that a government's "decisions as to the most effective reconciling of traditional policies should not be restricted beyond the commands of the Equal Protection Clause").

Those underlying principles support a reading of the Decree that gives the City alone the responsibility to put forth a reapportioned map. Reading the Decree to allow Appellants to put forth their own map for the district court's approval would surely contradict the Supreme Court's admonitions explained above. Doing so would allow Appellants, and the district court, to impermissibly bypass the City's legislative process, which is to be given primacy in these disputes. *Id*; *see also Reynolds v. Sims*, 377 U.S. 533, 586 (1964) ("[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so."). Therefore, the Decree's explicit instruction that "the Defendants shall reapportion the aldermanic ward boundary lines" is controlling.

We agree with Appellants that the Decree's later reference to the "parties" entitled Appellants to a role in the process. We

disagree, however, with their assertion that they were denied that role by virtue of the fact that the court did not consider their map.

The City engaged in an open legislative process to create the new map. At the evidentiary hearing, the City established that notice of the proposed map was published in a local newspaper, as well as on the City's website. The City also made displays of the current and proposed maps available at City Hall for public review and comment. The meeting at which the map was presented to the City Council for approval was also open for public comments. Appellants had the ability during that process to propose their own suggestions and improvements for the new ward map. Moreover, their status as parties in this lawsuit afforded them the opportunity to challenge the map and point out its weaknesses to the court.

However, when read within the context of the underlying legal principles set forth above, the Decree indicates that it was the City's sole responsibility to reapportion the ward map. Therefore, the district court did not err in ruling that Appellants were not entitled to submit their own ward map for approval by the court.

### B. Constitutionality of Proposed Map

Having established that it was the City's responsibility to reapportion the wards, we are left only to determine whether the City's proposed map meets the relevant constitutional standards. "The Equal Protection Clause principle of 'one person, one vote' requires that officials be elected from voting districts with substantially equal populations." *League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 724 (7th Cir.

2014) (citing *Reynolds*, 377 U.S. at 577). Though it does not require exact mathematical precision, the Constitution does require a government to "make an honest and good-faith effort to construct its districts as nearly of equal population as is practicable." *Gaffney v. Cummings*, 412 U.S. 735, 743 (1973) (internal quotation marks and citation omitted). A maximum population deviation between voting districts of less than ten percent is presumptively constitutional. *League of Women Voters*, 757 F.3d at 725. However, when the maximum deviation is greater than ten percent, the government must present justifications for the variance. *Id.*

Because their proposed map had an overall deviation of just over 12%, the court held an evidentiary hearing to determine whether the variance was justified. The City, and in turn the court, relied heavily on the testimony of Thomas Somer, the City's corporation counsel. Somer was the City official primarily responsible for reapportioning the map, which he did with the help of a cartographer. He testified that his goal in redrawing the map was to change the configuration of the existing wards as little as possible, so as to maintain their historical configuration and their configuration as drawn for the map used in the Decree. To ensure that certain wards had sufficient populations, he used the natural boundaries of major thoroughfares as the dividing lines. He testified that these new boundaries also increased the wards' compactness and eased voter confusion that existed due to certain wards' unusual shape in the previous map.

These are all legitimate objectives that, absent the use of discriminatory criteria, could justify a variance in population between wards. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)

(specifically recognizing "making districts compact, respecting municipal boundaries, [and] preserving the cores of prior districts" as goals that can justify population deviations). Somer also explained how redrawing the map with those goals in mind resulted in the specific deviations present. *See id.* at 741 ("The [government] must, however, show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions."). The district court found his explanation credible, and we find no reason to quarrel with that determination.

Appellants have failed to present evidence, either in the district court or on appeal, that the City employed any discriminatory criteria or methods in its reapportionment. Instead, their arguments can generally can be boiled down to comparisons between the City's proposal and their own, which they deem to be more equitable. As we established above, however, neither the Decree, nor the underlying legal principles contemplate that the district court should review competing plans and choose between them.

At this stage in the litigation, all that was left for the district court to determine, and therefore for us to review, was whether the City's proposal met the constitutional requisites. Based on the evidence and testimony the City presented at the hearing, we agree with the district court that the City made a good-faith effort to reapportion the wards, adhering to the Decree and minimizing the population deviations as much as was practicable. Therefore, the district court was correct to conclude that the City's proposed map satisfies the constitutional principle of one person, one vote.

### III.  CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.