# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

February 27, 1991

Honorable Chet Brooks
Chairman
Senate Committee of the Whole
  on Redistricting
Legislature of the State of Texas
P.O. Box 12068
Austin, Texas 78711-2068

Honorable Tom Uher
Chairman
House Redistricting Committee
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-6

Re: Whether release of census counts subject to possible adjustment constitutes publication of the United States decennial census for purposes of article III, section 28, of the Texas Constitution and related questions (RQ-24)

Dear Gentlemen:

You request advice on matters relating to the construction of article III, section 28, of the Texas Constitution, the provision establishing the legislature's duty to apportion the state into senatorial and representative districts.

The state constitution directs the legislature to apportion state senatorial and representative districts ("legislative districts") at the first regular session "after the publication of each United States decennial census." Tex. Const. art. III, § 28. If, during such session "following the publication of a United States decennial census," the legislature "fail[s] to make such apportionment," the Legislative Redistricting Board ("LRB") is required to apportion. Id.

A census publication during a regular session immediately activates the constitutional apportionment duties of both the legislature and, if it fails, the LRB. Mauzy v. Legislative Redistricting Bd., 471 S.W.2d 570 (Tex. 1971). The underlying purpose of the 1948 constitutional amendment to article III, section 28, having been to "get on with the job of . . . redistricting," the constitutional obligations are activated at the earliest possible moment:

> [T]he overriding intent of the people . . . was to permit apportionment of the state into legislative districts at the regular session of the Legislature which is convened in January following the taking of the census, *if publication is either before convening or during the session.*

Id. at 573.

The Mauzy court explicitly avoided stating when "publication" occurred; however, in the same passage in which it declined to resolve the issue, the court highlighted that by a certain date in early 1971 (during a regular legislative session) "the Legislature had been furnished all census figures necessary to apportion the state into legislative districts." Id. .

The 1990 census presents Texas with unique circumstances. While there has been no injunction prohibiting the census enumeration from going forward, there has been an injunction, in the form of a stipulation of the parties to a lawsuit approved by a federal district court, which makes the reporting and publishing of the results of the enumeration provisional, until July 15, 1991, at the latest. Stipulation and Order, City of New York v. United States Dep't of Commerce, No. 88 CV 3474 (E.D.N.Y. July 17, 1989) ("City of New York"). Texas is a party to the lawsuit and is bound by the stipulation. See, City of New York (Order of July 13, 1990).

The provisional nature of the census population counts is occasioned by the requirement that the United States Department of Commerce ("department") follow a specified course of action that must culminate in its determination no later than July 15, 1991, whether to make a statistical adjustment of the 1990 decennial census. If it decides to adjust, the adjustment must be made and published by the deadline; if it decides not to adjust, a detailed explanation must be given by the deadline.

The specified course of action is unique in census annals. Paragraph 3 of the stipulation requires the department to undertake a post-enumeration survey ("PES") "of not fewer than 150,000 households . . . as part of the 1990 Decennial Census in a manner calculated to ensure the possibility of using the PES . . . to produce corrected counts usable for . . . legislative reapportionment." Information submitted in connection with this request shows that between 164,000 and 170,000 households were surveyed in the PES.

Paragraph 6 of the stipulation requires that the federal government's release or publication of "any population counts" from the 1990 census prior to the adjustment decision bear the following legend:

'The population counts set forth herein are subject to possible correction for undercount or overcount. The United States Department of Commerce is considering whether to correct these counts and will publish corrected counts, if any, not later than July 15, 1991.'

On February 5, 1991, the Census Bureau, an arm of the department, reported to the Governor of Texas the population counts described in section 141(c) of title 13 of the United States Code. The bureau describes these reports of population figures as "public law 94-171 counts," in reference to the enactment that adopted the provision codified as section 141(c). See generally Pub. L. No. 94-171, 89 Stat. 1023 (1975). These counts contain the disclaimer required by paragraph 6 of the City of New York stipulation and order.

NOTWITHSTANDING THEIR PROVISIONAL NATURE, THE RELEASE OF THE PUBLIC LAW 94-171 COUNTS ON FEBRUARY 5, 1991, IS A "PUBLICATION" UNDER TEXAS CONSTITUTION ARTICLE III, SECTION 28, AND THE LEGISLATURE MAY PROCEED TO FULFILL ITS LEGISLATIVE REDISTRICTING DUTIES

The release of the public law 94-171 counts means that the legislature now has population counts at a geographic level sufficient to perform its task of legislative redistricting. The question is whether the release of these counts is a "publication" triggering the constitutionally imposed redistricting duties of the legislature and, if necessary, the LRB. The question is one of state, not federal, law.

Because the 1948 state constitutional amendment (effective beginning in 1951) was enacted without regard to the unique circumstances attending the 1990 census, we cannot answer the crucial question without considering the purpose of the amendment and the legal and practical consequences of taking the purpose into account in determining its meaning and reach.

The task of discerning the amendment's basic purpose is eased enormously by the Mauzy decision. The purpose of the amendment is to establish a structure which compels expeditious reapportionment action for state legislative seats. That is, it forces the state government to "get on" with the task of redistricting. The task is assigned initially to the legislature. If it fails to act, even when it has had the necessary data only for a few days, under Mauzy the task falls to the LRB.

We must construe the meaning of "publication" against this backdrop. Certain overriding principles guide us. First, the people intend for the legislature to be given the opportunity and duty to act on these apportionment matters in the first instance. Second, if for whatever reason the legislature fails to act, the LRB must act. Third, the release of sufficiently detailed census data is the key event triggering state action.

We find no direct authority that determines whether the release of census data subject to the disclaimer in this case is the "publication" of a decennial census under the constitutional provision. We do find some guidance in Texas court decisions addressing closely related questions. In Holcomb v. Spikes, 232 S.W. 891 (Tex. Civ. App.--Amarillo 1921, writ dism'd), the court had to determine whether Lubbock County was entitled to elect a tax collector as of the November 1920 election under the constitutional provision that "in counties having 10,000 inhabitants, to be determined by the last preceding census of the United States, a collector of taxes shall be elected." Id. at 893 (emphasis added); see also Tex. Const. art. VIII, § 16 (1876 amended 1932 , 1954).

The only question before the court was whether the census taken in 1920 determined the population of Lubbock County for purposes of applying article VIII, section 16. The Director of the Census had issued a report before the November election certifying that the population of Lubbock County was 11,096 according to census returns. The court reviewed the census statutes and determined that the report was an official pronouncement under the law, of which the public and all officials might take notice. Holcomb v. Spikes, supra, at 893. The Director of the Census also gave a certificate stating that the census count was subject to correction. The court rejected the idea that the count should not be relied on, stating that "the fact that it may be corrected does not indicate that the census was not complete and then a public document under the law." Id. at 895.

The court in Ervin v. State, 44 S.W.2d 380 (Tex. Crim. App. 1931), relied on a preliminary count of the 1930 census returns in determining that Abilene had sufficient population to bring it within the statute requiring selection of a jury by the jury wheel system. The announcement of the census stated that the figures were preliminary and subject to correction. Citing Holcomb v. Spikes, the Texas Court of Criminal Appeals determined that the preliminary announcement of the census was an official announcement that should have guided the jury commissioners in their method of selecting a jury. See also Perkins v. State, 367 S.W.2d 140, 147 (Tex. 1963); Garrett v. Anderson, 144 S.W.2d 971 (Tex. Civ. App.--San Antonio 1940, writ dism'd judgm't cor.); Attorney General Opinions V-1310, V-1175 (1951); V-1137 (1950).

The principles underlying Mauzy, Holcomb, and Ervin all point toward the conclusion that, notwithstanding its provisional nature, the release of the public law 94-171

counts on February 5, 1991, constitutes a "publication" within the meaning of article III, section 28, of the constitution. This conclusion is consistent with the principle announced in Attorney General Opinion MW-350 (1981). There, we concluded that publication of the 1980 census population data was a triggering "publication" under article III, section 28, notwithstanding the census bureau's having labelled it "provisional" due to pending federal litigation challenging the validity of the figures. The legend affixed to the just-released 1990 census population totals is the functional equivalent of the "provisional" label the census bureau used to describe the 1980 census population totals.

We see no reason to depart from the principle announced in that opinion. In fact, we see very sound reasons, grounded in case law and the underlying purposes of article III, section 28, for adhering to it.

## A POST-SESSION CENSUS ADJUSTMENT WOULD BE ANOTHER "PUBLICATION," TRIGGERING, IF CERTAIN CIRCUMSTANCES ARE PRESENT, THE REDISTRICTING DUTIES OF THE LRB FIRST ON AN INTERIM BASIS AND, IN THE NEXT REGULAR SESSION, THE LEGISLATURE AND LATER, IF NEEDED, THE LRB

The foregoing conclusion that release of the provisional population counts is nonetheless a publication under the constitution does not preclude there being another publication of the population counts if an adjustment is made. In considering this possibility, we will assume that the second publication date of the 1990 census would be after the current regular session.[1] Assuming that the department does not make its adjustment decision until the last day, that date would be July 15, 1991. Would the release by the department of adjusted population counts constitute yet another "publication" under article III, section 28, of the constitution? We conclude that it would.

We already have explained the uniqueness of the 1990 census. The Bureau of the Census has noted that a statistical adjustment of the count would be "for the first time in the history of the Census." 54 Fed. Reg. 51004 (1989). In the past, as exemplified in some of the references in Holcomb v. Spikes, the Bureau of the Census has made corrections to its published census figures. These corrections, however, were not premised on the gathering of new enumeration data. In 1990, in unique circumstances, the Bureau of the Census, under federal court order, has undertaken a new round of data gathering through

---

[1] Nothing in the stipulation prevents the adjustment decision from being made before the end of the current regular session of the legislature. Such an action is not anticipated, but, if it occurs, the Mauzy principle means that the triggering event will have occurred during the current regular session.

the PES.  The PES is in effect a mini-census based on additional enumeration efforts of a substantial magnitude, different in kind from the steps leading to past technical corrections.

The PES and data derived from it will form the basis for the department's decision about whether to adjust the census.  Under guidelines adopted by the department, the adjustment will not take place unless, among other things, "[t]he resulting counts [are] of sufficient quality and level of detail to be usable for . . . legislative redistricting." City of New York v. Department of Commerce, 739 F. Supp. 761, 769 (E.D.N.Y. 1990) (emphasis in original).

The circumstances surrounding the upcoming census adjustment decision, especially the massive new data gathering preceding it, lead us to the conclusion that should an adjustment occur, it will constitute a new "publication" of the decennial census under the Texas Constitution.  If the adjustment is made, it too will be a "publication" of the federal decennial census, regardless of the degree of difference in the adjusted and unadjusted data.

If an adjustment and therefore a second publication occurs, a question would arise as to whether the LRB would be empowered to undertake its constitutional redistricting responsibilities, and what effect the LRB's acquisition would have on the legislature's reapportionment jurisdiction.  We address the latter part of the question first.

At first glance, the plain words of article III, section 28, suggest that the legislature has no state legislative redistricting powers in a special session between census publication and a regular session.[2]  In contrast to the pre-1948 version of the provision which referred to the "first session," the current provision mandates legislative action at its "first regular session" following publication.

The Texas Supreme Court was not presented and did not answer the question in Mauzy, 471 S.W.2d at 574, although some of its language seems to implicitly endorse the

---

[2]    Article III, section 28, does not speak to congressional redistricting or state board of education redistricting.  Thus, it is not a restriction on the legislature's powers during a special session concerning those two activities.  There being no other state constitutional provisions on this topic, the legislature has the power to undertake redistricting during special sessions for congressional and state board of education seats.  Cf. Attorney General Opinon O-6488 (1945) (predating the 1948 amendments which added "regular session" language to article III, section 28, and suggesting that redistricting is a "continuing duty" which may be performed during special session).

view that the legislature is constitutionally disabled from performing its legislative redistricting tasks in an interim special session after census publication but before its next regular session. To buttress the conclusion that publication during the regular session triggered the requirement of action during that session, the Mauzy court observed that "the other side of the coin" from its central holding would mean a two year delay in redistricting, until the next regular session. Id. at 573. This observation is wrong if the legislature may redistrict during a special session between a post-regular session census publication and a regular session. Yet, we cannot read too much into this language because it implicitly reaches the very question the court explicitly stated that it was reserving. Thus, we must look beyond Mauzy to answer the question.

The place we look is the governing constitutional provision. Article III, section 28, ties the allocation of institutional redistricting responsibilities between the legislature and the LRB to the fact of census publication, not the data published. Within that framework, the two institutions' jurisdictional responsibilities may not overlap. Thus, it is clear that the legislature may not redistrict itself in special session during the jurisdictional period of the LRB. This interpretation coincides with the factual circumstances and analysis in Attorney General Opinion M-881 (1971).

Whether the legislature may reapportion itself under other circumstances is a complex question that requires additional research and analysis. We are uncertain whether your inquiry extends to other circumstances and, due to the time constraints applicable to your other questions, defer addressing them.

If the legislature fails to redistrict during the current regular session, which failure is followed by a post-session census publication within the jurisdictional period of the LRB, the LRB is empowered to undertake its redistricting responsibilities. Mauzy teaches that the LRB's jurisdiction is conditioned on the legislature's failure to make an apportionment consistent with certain state constitutional provisions. Mauzy, 471 S.W.2d at 574. Thus, under Mauzy we necessarily conclude that the LRB's responsibilities are triggered by the legislature's failure to redistrict during regular session, regardless of whether new census counts are published following the session but during the LRB jurisdictional period. The question of whether, under such circumstances, the LRB, as a matter of law, must use the population counts in a second publication is addressed in the last section of this opinion.

There is less prior guidance on a related question about the LRB's powers and duties in the event of a second post-session census publication, when the legislature has redistricted during the regular session of the first publication. Mauzy does not specifically address the issue presented by this unique circumstance.

Consistency with one central purpose of the constitutional provision (giving the legislature the first obligation and opportunity to act) suggests that the LRB should not be empowered to act under the peculiar circumstances assumed here. Yet, consistency with another central purpose of the provision (establishing the mechanism for some state entity to redistrict expeditiously upon publication of new census data) suggests that the LRB may be empowered to act upon the new publication.

Because the constitutional structure did not envision the peculiar circumstances confronting us here, we have no prior case law precisely on point, and any conclusion we reach is therefore attended by a higher than usual degree of uncertainty. Nonetheless, we believe that the principles underlying article III, section 28, of the constitution and Mauzy support the conclusion that the publication of new census data may, but does not necessarily, trigger LRB jurisdiction to undertake legislative redistricting following publication of the new data, even if the legislature has redistricted following the February 5 publication.

Whether, in such an instance, the legislature has failed to make an apportionment in the same sense that, as Mauzy held, it has failed to make an apportionment when its redistricting plan is judicially invalidated within the jurisdictional time frame for the LRB depends upon factual circumstances which we cannot address in the opinion process. It cannot be determined in advance whether the second set of published census data would result in invalidation of the legislature's redistricting plan enacted following publication of the first set of census data. If it does, and the invalidation occurs within the LRB's jurisdictional period, then the LRB's duties to redistrict are triggered; if it does not, then they are not.

Regardless of whether the legislature has failed to redistrict during the regular session of the first census publication, the question arises as to the reach of the LRB's redistricting powers if a second census publication occurs during its jurisdictional period. Article III, section 28, sets the limit here. Under this scenario, the LRB's jurisdiction could vest, at most, only for the LRB jurisdictional period outlined in the constitution. More importantly, its jurisdiction would be limited to the period until the next regular session of the legislature. Thus, under article III, section 28, it would be empowered to enact what we will term an "interim apportionment plan," good only until the next regular session of the legislature. The convening of the next regular legislative session would initiate a new round of article III, section 28, obligations for the legislature first and, in the event of a failure to reapportion, the LRB second. This approach maintains to the maximum extent permitted by the language and intent of the constitution the established order of institutional responsibilities.

THE CONCLUSION THAT A "PUBLICATION" HAS OCCURRED UNDER STATE LAW IS NOT
TANTAMOUNT TO VALIDATION OF THE PROVISIONAL CENSUS COUNTS, WHICH TEXAS
CONTINUES UNABATEDLY TO CHALLENGE

The language of our state constitution does not equate publication of census data with its validation. The conclusion announced here should not and may not be read as a rejection of the argument that the provisional 1990 decennial census counts are inaccurate and disproportionately miss minorities in Texas. We represent the state in a federal lawsuit, the City of New York case, arguing that minorities are disproportionately undercounted in the current census and that, as a result, the department has a federal constitutional duty to statistically adjust the data to correct for the undercount.[3] We also have argued to the department that it should make the adjustment. Thus, on behalf of the state, we reject any claim that the recently released data is as accurate as practicable, which is the federal constitutional requirement. See City of New York v. Department of Commerce, 713 F. Supp. 48, 50 (E.D.N.Y. 1989). Our litigation continues, unabated by the conclusions reached in this opinion.

The department in the first instance and ultimately the federal courts will answer this question definitively. We cannot do it here, and we have not undertaken to do so. The unavoidable fact remains that census population counts, down to the census block level, that is, down to a level sufficient for redistricting, has occurred.

THE LEGISLATURE IS NOT PROHIBITED AS A MATTER OF LAW FROM ADJUSTING THE
PROVISIONAL PUBLIC LAW 94-171 CENSUS COUNTS IN ORDER TO PERFORM ITS
LEGISLATIVE REDISTRICTING DUTIES

Correspondence from members of the legislature[4] has raised the issue of whether the legislature must use the February 5 census counts in redistricting. Implicit in your sixth question is a related question: whether the LRB must use the population counts in the second census publication (that is, the adjusted census counts) in performing its redistricting responsibilities. The answer affects both the legislature and the LRB.

---

3      We also seek an adjustment to insure that Texas and its political subdivisions receive their fair allocation of federal funding under federal programs whose allocation formulas are based on decennial census counts.

4      This correspondence is from the 17 members of the Mexican-American Legislative Caucus.

This more basic question is whether the triggering event of publication also requires that the published data be used as the sole basis for determining population for state legislative redistricting, regardless of its accuracy and its disproportionate impact on segments of the population. The population data contained in the triggering publication is not the sole permissible basis for determining the population base to be used in the process of redistricting.

The federal Equal Protection Clause and United States Supreme Court precedent elucidating its reach in the context of state legislative redistricting must be consulted to understand what data the legislature may and must use as a guide in undertaking its redistricting responsibilities. The Supremacy Clause of the United States Constitution establishes the primacy of those federal standards over state constitutional standards. "The requirement of the United States Constitution takes precedence and any inconsistency therewith in the Texas Constitution is thereby vitiated." Smith v. Craddick, 471 S.W.2d 375, 377 (Tex. 1971) (considering requirements of article III, section 26, of the Texas Constitution).

In Reynolds v. Sims, 377 U.S. 533, 568 (1964), the Supreme Court held that the equal protection clause requires state legislative seats to be apportioned on a population basis. The districts must be as nearly of equal population as practicable, id. at 577, although deviations from absolute equality have been permitted. See, e.g., White v. Regester, 412 U.S. 755, 763-65 (1973) (upholding 9.9% total maximum deviation). The most recent federal court pronouncement in this area also concludes that population is an appropriate basis for state legislative apportionment. Garza v. County of Los Angeles, 918 F.2d 763, 774 (9th Cir. 1990), cert. denied, 111 S.Ct. 681 (1991); cf. Burns v. Richardson, 384 U.S. 73, 91 (1966) (stating that the equal protection clause does not require that federal census population figures be used in redistricting, but doing so in a context where the use of other figures yielded substantially the same result). The problem, though, is how the basic building block of population is to be ascertained.

In Gaffney v. Cummings, 412 U.S. 735, 745-47 (1973), the Supreme Court discussed the inexactitude of the census both in the snapshot it takes of the nation's population and due to the passage of time. In particular, the court observed that the census' inexactitude is "most evident with respect to minorities." Id. at 745 n.10. Finally, Gaffney recognized that, in reapportioning state legislatures, states are permitted to work with "both political and census data." Id. at 753-54.

A review of the cases after Reynolds, Burns, and Gaffney indicates that courts have not read the federal constitution as requiring states to adhere rigidly to federal census

counts in determining the population basis for legislative apportionment. The cases typically arise in the context of whether the passage of time has made the most recent census an outdated demographic indicator. The matter being highly fact-bound, the cases reveal no settled formula for when departures or adjustments are permissible, but a general outline of what is permissible emerges.

First, as stated by the Supreme Court of Kansas, "[t]he information contained in [state and federal censuses] is presumed to be accurate and is prima facie correct until proven otherwise." In re Stephan, 775 P.2d 663, 667 (1989). Second, as stated in a Texas legislative redistricting case, a "'high degree of accuracy' [is] required to supplant the population figures of the prior decennial census." Graves v. Barnes, 446 F. Supp. 560, 568 (W.D. Tex. 1977) (3-judge court), aff'd sub nom. 435 U.S. 901 (1978) (citing Kirkpatrick v. Preisler, 394 U.S. 526, 535 (1969)). Another formulation of this second test is that the decennial census figures control unless "'clear, cogent and convincing evidence'" demonstrates that they no longer are valid and that other figures are valid. Dixon v. Hassler, 412 F. Supp. 1036, 1040 (W.D. Tenn. 1976) (3-judge court), aff'd 435 U.S. 901 (1978). Third, as stated by a court evaluating, among other things, a Massachusetts legislative redistricting plan, the courts have a common sense preference for "the most recent and accurate measure of population." Black Political Task Force v. Connolly, 679 F. Supp. 109, 115 (D. Mass. 1988) (3-judge court) (citing Latino Political Action Comm. Inc. v. City of Boston, 568 F. Supp. 1012, 1018 (D. Mass. 1983) (approving use of mid-decade population estimates based on but different from decennial census)).

Our state constitution further complicates the rules for when departures from rigid adherence to federal census data for determining population bases for apportionment are permissible. Article III, section 26, requires that the ideal district size for a house of representatives seat be determined by dividing the number of house members into the state population "as ascertained by the most recent United States census," provided that certain rules regarding apportionment among counties are satisfied.[5]

---

[5]     This office previously determined that the "qualified electors" apportionment base for state senatorial districts in article III, section 25, is unconstitutional on its face because it violates the dictates of the federal Equal Protection Clause. See Attorney General Opinion MW-350 (1981). The opinion relied on the summary judgment invalidation of the "qualified electors" provision of article III, section 25, in Kilgarlin v. Martin, C.A. No. 63-H-390 (W.D. Tex. Jan. 11, 1965). A subsequent state court redistricting challenge premised on the viability of the "qualified electors" provision was dismissed as moot. Upham v. White, 639 S.W.2d 301 (Tex. 1982).

In each of the last two decades, this state constitutional provision has led to judicial invalidation of redistricting plans for the state house of representatives because they cut too many county lines. See Clements v. Valles, 620 S.W.2d 112 (Tex. 1981); Smith v. Craddick, supra. These decisions recognize the primacy of federal equal protection law in this field, but establish the following rule of state law in evaluating redistricting plans: the burden is on those challenging state house redistricting plans to show that they violate article III, section 26, for cutting county lines, but, if they satisfy their burden, the burden shifts to the proponents of the plans to show that the cutting of county lines was "necessary" to satisfy federal requirements for equal representation. Clements v. Valles, 620 S.W.2d at 114.

The opinion process does not permit this office to evaluate or resolve fact questions. Thus, we can only conclude here that there is not as a matter of law an outright prohibition on the use of population data other than federal census population data in legislative redistricting. We are not equipped in the opinion process to speculate on the technical proof necessary to justify departure from the federal census population counts, on the appropriate methodology for any state adjustment to the census population data, or on the effect of such adjustments on the interaction of federal equal protection requirements with state constitutional requirements for apportionment. Whether to attempt the state's own adjustment of the public law 94-171 counts for purposes of legislative redistricting and, if so, how to make such an adjustment are matters for the legislature and the LRB.

## SUMMARY

The release on February 5, 1991, of 1990 census population data (i.e., the public law 94-171 counts), notwithstanding their provisional nature, constitutes a publication within the meaning of article III, section 28, of the constitution. The legislature and the LRB, however, are not as a matter of law prohibited from using population counts other than the public law 94-171 counts in determining the population base for apportionment of the state legislature. The legislature may not convene to reapportion itself in special session during the jurisdictional time period of the LRB. If the United States Department of Commerce, on its own or under court order, statistically adjusts the 1990 census based on its post enumeration survey after the regular session but within the LRB's jurisdictional time period following the end of the current regular session, the LRB has limited jurisdiction to apportion the state legislature. Under these circumstances, the LRB's reapportionment duties definitely arise if the legislature failed to redistrict during regular session and, depending on factual

circumstances, may arise even if the legislature enacted a redistricting plan during regular session. Still, under these circumstances, the LRB would be empowered to redistrict only on an interim basis, until the next regular session of the legislature. A statistical adjustment to the 1990 census by the department, based on the post-enumeration survey, shall be treated as a new publication of the decennial census within the meaning of article III, section 28.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY (Ret)
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

SUSAN GARRISON
Acting Chairman, Opinion Committee