419

CLERK OF COURT
SUPREME COURT. CNMI
FILED

·93 JAN 21 A 8: 5⁵

BY: _____

## IN THE SUPREME COURT OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

HERMAN S. SABLAN and ANTONIO T. SALAS, )
 Plaintiffs/Appellants, )
 vs. )
ELOY INOS, DIRECTOR OF FINANCE; )
CNMI DEPARTMENT OF FINANCE; )
DIVISION OF REVENUE AND TAX; )
COMMONWEALTH GOVERNMENT, LORENZO )
I. GUERRERO, GOVERNOR OF THE CNMI,)
 Defendants/Appellees. )

APPEAL NO. 91-018
CIVIL ACTION NO. 91-734

OPINION

Argued and Submitted December 23, 1991
Resubmitted December 9, 1992*

Counsel for Plaintiffs/Appellants: Robert J. O'Connor
 P.O. Box 1969
 Saipan, MP 96950

Counsel for Defendants/Appellees : Eric Smith
 Assistant Attorney General
 Attorney General's Office
 2nd Administration Building
 Capitol Hill
 Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ and BORJA, Justices.

---

\* Special Judge Larry L. Hillblom was designated to sit on the panel of this appeal on September 18, 1991 because the Chief Justice was off-island at the time. On December 9, 1992, he recused himself and the Chief Justice rejoined the panel. The case was resubmitted to the reconstituted panel and the parties agreed to waive another oral argument.

VILLAGOMEZ, Justice:

I.

The plaintiffs filed a complaint on July 9, 1991, seeking to enjoin the defendants from disclosing plaintiffs' tax returns and return information to the Inspector General of the U.S. Department of Interior ("IG"). They alleged that a disclosure of their tax returns would violate the tax confidentiality provisions of 4 CMC § 1701(d), as well as their right to privacy guaranteed by the CNMI Constitution. Plaintiffs asked the trial court to take constructive custody of all tax returns and return information filed with the government so as to prevent their production to the IG in connection with the IG's proposed audit of the CNMI tax system. At the same time, plaintiffs applied for a temporary restraining order and permanent injunction against the defendants.

On July 10, 1991, the trial court denied the application for restraining order and permanent injunction on the basis that the IG was not made a party to the lawsuit. The trial court stated in its order:

> The thrust and gravamen of plaintiffs' complaint is to enjoin the IG from carrying out an audit of the defendants and they must join the IG as a party. Failure to do so dictates a denial of plaintiffs' application for a restraining order or injunction.

The trial court assumed that 48 U.S.C. § 1681b[1] applies in the CNMI. It concluded without discussion that what the "plaintiffs

---

[1] This statute authorizes the IG to audit the accounts of the CNMI Government.

421

are actually seeking is an injunction against the enforcement of 48 U.S.C. § 1681(b)."

The court did not dismiss the complaint, noting that the case was still at a preliminary stage and plaintiffs could still join the IG. The same day, plaintiffs petitioned this Court for a writ of mandamus to require the lower court to proceed without the IG, as a party to the lawsuit, and to restrain the defendants. On July 30, 1991, we denied the petition for mandamus on the basis that the lower court's ruling (that the IG was an indispensable party) was not clearly erroneous for purposes of mandamus and the injunction sought was premature.[2]

On August 18, 1991, plaintiffs filed an amended complaint setting forth additional allegations that the IG would in fact audit plaintiffs' tax returns. They also moved for reconsideration of the earlier denial of a temporary restraining order and permanent injunction. The next day, the trial court denied the motion for reconsideration and dismissed the action without prejudice because plaintiffs still had not joined the IG.

On August 20, 1991, the plaintiffs appealed the dismissal of the action.[3] They also filed a second petition for mandamus and, in the alternative, an emergency motion to enjoin the defendants

---

[2] Sablan v. Superior Court, Orig. Action No. 91-002 (N.M.I. July 30, 1991) (Order Denying Mandamus).

[3] At the time of the appeal, the IG had not issued his subpoena against the Governor. The subpoena issued in December, 1991, after which the parties requested an expedited hearing and decision on this appeal. When the Governor objected to the IG's subpoena, the IG sought enforcement thereof from the Federal District Court. The District Court issued its order on July 24, 1992, enforcing the IG's subpoena. U.S. v. Deleon Guerrero, Misc. No. 92-00001 (D.C.N.M.I. July 24, 1992) (Decision and Order Granting Enforcement of Administrative Subpoena). That order has been appealed to the Ninth Circuit.

from disclosing their tax returns pending appeal. We denied the petition for mandamus, but enjoined the release of the tax returns pending appeal and ordered the Superior Court to temporarily take constructive possession of such documents.

The appeal was argued on December 23, 1991. On December 26, 1991, at the request of the parties, we issued an expedited order to be followed by this opinion setting forth our analysis and reasoning.

## II.

Although three issues were raised on this appeal, in our December 26, 1991 order, we addressed only the first two issues. The issues are:

1. Whether the Inspector General is an indispensable party to the lawsuit;

2. Whether the defendants are prohibited by law from disclosing plaintiffs' tax returns and return information to the Inspector General; and

3. Whether the trial court should take custody and constructive possession of the tax returns and return information.[4]

The first issue is the main issue. However, in order to determine whether the IG is an indispensable party, we need to address the second issue, a subsidiary issue, which relates to the applicability of 48 U.S.C. § 1681b to the CNMI. We summarily

---

[4] The first two issues raise questions of law which we review de novo. The third issue is reviewed for abuse of discretion.

dispose of the third issue, _infra_.

### III.
### INDISPENSABILITY OF INSPECTOR GENERAL

Rule 19, Com.R.Civ.P., governs the determination of whether a person needs to be joined as a party. It provides:

> (a) _Persons to be Joined if feasible_. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if
>
>> (1) in his absence complete relief cannot be accorded among those already parties, or
>>
>> (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may
>>
>>> (i) as a practice [sic] matter impair or impede his ability to protect that interest[,] or
>>>
>>> (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the Court shall order that he be made a party.

We hold that the IG need not be joined as a party to the lawsuit for the following reasons.

The relief sought by the plaintiffs is essentially to prohibit the release of their tax documents to the IG, in view of the proposed federal audit under 48 U.S.C. § 1681b. The relief requested would run only against the Commonwealth Government which

424

has custody of such documents. Therefore, complete relief can be accorded among those already parties to the lawsuit.

As explained _infra_, the trial court's ruling that the IG is an indispensable party was based on its view that 48 U.S.C. § 1681b, under which the IG sought to conduct its audit of the Commonwealth's tax system, applies to and has validity in the Commonwealth. To the extent that such federal law violates the fundamental provisions of the Covenant, we find that such law has no force and effect in the Commonwealth and cannot be applied. Thus, there is no interest that the IG can claim would be affected by the lawsuit.

The IG has been aware of this action since plaintiffs filed their original complaint on July 9, 1991. Yet, it has not asserted any interest in joining this litigation. The IG instead has since chosen to subpoena the Governor of the Commonwealth and later sought the enforcement of its subpoena before the District Court.

Since the basis for the IG's interest in this lawsuit rests on a statute which we find to be inapplicable in the CNMI; and since complete relief can be awarded in its absence; and since the IG has failed to assert its interest herein; we are of the opinion that it is not an indispensable party to the lawsuit.

## IV.
## THE IG'S AUTHORITY TO AUDIT THE LOCAL TAX SYSTEM OF THE CNMI

In our order of December 26, 1991, we ruled that the federal statute, 48 U.S.C. § 1681b, which authorizes the IG to audit the accounts of the Commonwealth of the Northern Mariana Islands

425

("CNMI"), contradicts the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant") and as a result, has no force and effect in the CNMI.[5] In concluding that the IG is an indispensable party, the court below assumed that the federal statute authorizing the proposed audit has validity in the CNMI. The court, in its order denying plaintiffs' application for TRO, states:

> Although not specified in the complaint or the application for the injunction, it is clear the proposed audit is pursuant to 48 U.S.C. § 1681(b). This section, inter alia, states the IG has the power and duty to audit all accounts pertaining to the revenue and receipts of the government of the Northern Mariana Islands.
>
> Thus, what the plaintiffs are actually seeking is an injunction against the enforcement of 48 U.S.C. § 1681(b).

For the reasons set forth below, we conclude that because 48 U.S.C. § 1681b violates the fundamental provisions of the Covenant, it cannot be enforced in the CNMI and the IG has no authority to audit the CNMI tax system. It is, therefore, not an indispensable party.

Section 1681b(a)(1) of Title 48 of the U.S. Code authorizes the IG to audit all accounts pertaining to the revenue and receipts of the government of the CNMI and all expenditures of funds and

---

[5] The legislative history and detail explanation of the purpose and effect of each section of the Covenant is set forth in separate documents, one of which consists of the Section-by-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands (Feb. 15, 1975) ("Covenant Analysis"), reprinted in To Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands" and for Other Purposes: Hearing Before the subcommittee of the House Committee on Interior and Insular Affairs on H.J. Res. 549, H.J. Res. 550, and H.J. Res. 547 ("House Hearings"), 94th Cong. 1st Sess. 626-665 (July 14, 1975) and Northern Mariana Islands: Hearing before the Senate Committee on Interior and Insular Affairs on S.J. Res. 107 ("Senate Hearings"), 94th Cong. 1st Sess. 359-496 (July 24, 1975).

property pertaining to the CNMI including trust funds. Section 1681b(a)(2) provides that the IG is authorized to report to the Secretary of the Interior and the Governor of the CNMI all failures to collect amounts due the CNMI government and expenditures of funds or uses of property which are irregular or not pursuant to law.

This federal statute does not limit the authority of the IG to audit only the receipts or expenditures of U.S. funds or U.S. properties in the CNMI. It authorizes a federal audit of all receipts, expenditures and properties of the CNMI government. The CNMI, however, has not consented to an enactment of a federal statute which compromises the CNMI's right to internal self-government or the enactment of 48 U.S.C. § 1681b.

In our order of December 26, 1991, we ruled that the tax system of the CNMI is an internal affair of the CNMI established by local law. The CNMI's tax system, created by CNMI law to support the CNMI Government, is a matter of local self-government.

The U.S. statute which authorizes the IG to audit such tax system, if enforced, would infringe upon the right of the CNMI to govern itself. We reach this conclusion based on the fundamental provisions of the Covenant which govern the relationship between the United States and the CNMI.

**A. The Covenant**

The entire relationship between the United States and the

Commonwealth is governed by the Covenant.[6] "A covenant is a binding agreement like a contract or a compact." Covenant Analysis at 1. The term "covenant" was chosen "because the relationship between the United States and the Northern Marianas will be a permanent one, which in its fundamental respects will not be able to be changed by one party without the consent of the other." Id.

The Covenant is not a unilateral enactment by the U.S. Congress. It is not an Organic Act, which Congress could unilaterally change at its pleasure. Years of negotiations between the executive branch of the U.S. Government and the Marianas Political Status Commission produced the Covenant as a bilateral agreement between the United States of America and the people of the Northern Mariana Islands. On the U.S. side, the Covenant agreement was approved by a joint resolution of the Congress which was signed by the President. On the CNMI side, the Covenant was approved by the Marianas District Legislature and by the people of the CNMI in a plebiscite. Without the approval of the Covenant by the people of the CNMI, the U.S. joint resolution, signed by the President, could not effectuate the Covenant.

We have previously stated:

> The Covenant is not just a simple contract. It is the product of years of negotiations between the representative of the people of the United States of America (through the President) and representatives of the people of the Northern Marianas. Its composition is complex and its identity unique. It is a binding

---

[6] Section 102 of the Covenant provides in part: "The relationship between the Northern Mariana Islands and the United States will be governed by this Covenant . . . ." "This assures that the Covenant is the fundamental document which must be followed by both sides." Covenant Analysis at 9.

428

commitment by two peoples with certain provisions being so sacrosanct as to be unchangeable without the consent of both parties.

Wabol v. Villacrusis, No. 89-005, 1 N.Mar.I. 19, 22 (1989), appeal docketed, No. 90-15101 (9th Cir. Feb. 1, 1990).

Because the Covenant is a binding bilateral agreement between the United States and the people of the CNMI, neither party may unilaterally amend its fundamental provisions without the consent of the other. To do so would constitute a material breach of the Covenant.

■ In entering into the Covenant, the United States fulfilled its U.N. Trusteeship obligation to have the people of the NMI exercise their inherent right of self-determination.[7]

The people of the CNMI entered into the Covenant to become a self-governing commonwealth in political union with and under the sovereignty of the United States.[8]

Prior to entering into the Covenant, the people of the NMI did not exercise any significant degree of internal self-government. They did not make their own laws, interpret their own laws, or enforce their own laws. The people of the NMI did not enter into

---

[7] The joint resolution approving the Covenant states in part: "Whereas the United States, . . . in response to its own obligations under the trusteeship agreement to promote self-determination, . . . ."

[8] The Preamble to the Covenant states:

> [T]he Marianas Political Status Commission, being the duly appointed representative of the people of the Northern Mariana Islands, and the Personal Representative of the President of the United States have entered into this Covenant .in order to establish a self-governing commonwealth for the Northern Mariana Islands within the American political system and to define the future relationship between the Northern Mariana Islands and the United States.

Section 101 of the Covenant states: "The Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth to be known as the 'Commonwealth of the Northern Mariana Islands', in political union with and under the sovereignty of the United States of America."

429

the Covenant to become a territory or possession of the United States,[9] as those terms are used in the U.S. Constitution.

In interpreting the Covenant, the aspirations of the people of the CNMI and the purpose for which the U.S. entered into the Covenant should be kept in mind.

## B. U.S. Sovereignty and CNMI Self-Government

Section 101 of the Covenant places the CNMI under the sovereignty of the United States. Section 103 guarantees to the people[10] of the CNMI the right to self-government, and assures that they will govern themselves with respect to their internal affairs.[11]

While it may be difficult to draw the line where CNMI self-government ends and U.S. sovereignty begins, it is clear from the document itself that at the very least the U.S. has absolute

---

[9] Covenant Analysis at 11 states: "The fact that the people of the Northern Marianas will have the right of local self-government and will govern themselves under their own Constitution means that the Northern Mariana Islands will not be an agency or instrumentality of the United States Government. A territory is merely part of the United States Government and is subject to the direction of the Congress and Executive Branch of the Government."

[10] "People of the Northern Mariana Islands" as used in the Covenant means those people who are described in Section 301(a)(b) and (c) of the Covenant as follows:

(a) all persons born in the Northern Mariana Islands who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, and who on that date are domiciled in the Northern Mariana Islands or in the United States or any territory or possession thereof;

(b) all persons who are citizens of the Trust Territory of the Pacific Islands on the day preceding the effective date of this Section, who have been domiciled continuously in the Northern Mariana Islands for at least five years immediately prior to that date, and who, unless under age, registered to vote in elections for the Mariana Islands District Legislature or for any municipal election in the Northern Mariana Islands prior to January 1, 1975; and

(c) all persons domiciled in the Northern Mariana Islands on the day preceding the effective date of this Section, who, although not citizens of the Trust Territory of the Pacific Islands, on that date have been domiciled continuously in the Northern Mariana Islands beginning prior to January 1, 1974.

[11] Covenant Analysis at 10.

control over foreign affairs and defense, and the people of the CNMI have the right to self-government with respect to their internal affairs.

When the Covenant provides that "[t]he people of the Northern Mariana Islands will have the right of local self-government <u>and</u> will <u>govern themselves</u> with respect to internal affairs,"[12] it means that it is the <u>people</u> of the <u>CNMI</u> who will <u>govern</u> -- not Congress. At a minimum, the people of the CNMI will enact local laws, interpret local laws, and execute local laws -- not the federal government.[13]

At the same time, when the Covenant provides that "[t]he Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth . . . <u>under the sovereignty</u> of the United States of America," (emphasis added) it means that the U.S. has sovereignty except as limited by the Covenant. For example, federal laws and constitutional provisions which apply throughout the states and territories would generally apply to the CNMI unless the Covenant provides otherwise, e.g.,

---

[12] Covenant Section 103. (Emphasis added.)

[13] Any suggestion that "self-government" as used in the Covenant means "institutional self-government" is not supported by any provision of the Covenant or its Analysis. If the parties to the Covenant meant for the CNMI to have merely institutional self-government, after years of negotiations, drafting and redrafting, they would have said so. The Covenant uses only the term "self-government" and the Analysis states that, "the people have the right of self-government explicitly," and "[t]he Northern Mariana Islands government will be an independent government, like that of the states." Covenant <u>Analysis</u> at 11. Self-government "means that the <u>people</u> will determine their own <u>form</u> of government <u>and</u> the <u>manner</u> in which they will <u>govern themselves</u> with respect to local affairs." Covenant <u>Analysis</u> at 6. (Emphases added.) Such description of self-government strongly supports a substantive, rather than institutional, self-government.

An institutional self-government would be nothing more than an illusory self-government. That is not the type of self-government that the people of the NMI aspired to, or what the U.N. Charter and the Trusteeship Agreement guaranteed.

431

jury trial,[14] land ownership,[15] composition of the CNMI senate,[16] immigration laws,[17] internal self-government, etc. Where the Covenant provides that the U.S. laws control, such as in matters of foreign affairs and defense, the U.S. has absolute political authority. Where it appears that a federal law violates a fundamental provision of the Covenant, such law should be scrutinized to determine whether it in fact contravenes any such fundamental provisions. If it does, then the Covenant negates its applicability to the CNMI.

## C. U.S Legislative authority over the CNMI

The first sentence of Section 105 of the Covenant provides that "[t]he United States may enact legislation in accordance with

---

[14] Covenant Section 105 provides in part: "neither.trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law." Amendment V to the U.S. Constitution requires an indictment by a Grand Jury and Amendment VI requires a speedy and public trial by an impartial jury. These constitutional provisions do not apply to the CNMI because of the Covenant.

[15] Covenant Section 805 provides in part that the Government of the CNMI "will . . . regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent." Article XII of the CNMI Constitution restricts land ownership to persons of Northern Marianas descent. Amendment XIV to the U.S. Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Although Article XII of the CNMI Constitution treats U.S. citizens in the CNMI unequally with respect to land ownership, this is permissible under the Covenant.

[16] Covenant Section 203(c) provides in part: "The Constitution of the Northern Mariana Islands will provide for equal representation for each of the chartered municipalities of the Northern Mariana Islands in one house of a bicameral legislature." Thus, Saipan which has over ten times more people than Rota or Tinian is equally represented in the Senate. The U.S. Supreme Court has ruled that the Federal Constitution demands that each citizen have an equally effective voice in the election of members of his state legislature. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362 (1964). An individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted compared to the vote of citizens living in other parts of the state. Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321 (1973). Although the weight of the votes in Rota and Tinian for Senators is much greater than the votes in Saipan (violating the people of Saipan's fundamental right to vote), this is permissible under the Covenant.

[17] See Covenant Section 506.

its constitutional processes[18] which will be applicable to the Northern Mariana Islands . . . ." By this provision, the Congress may enact laws applicable to the CNMI. While Congress has the authority to legislate as to the CNMI, Congress has also expressly agreed to limit that authority with respect to the fundamental provisions of the Covenant.

The second sentence of Section 105 of the Covenant provides: "In order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II, III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands." (Emphasis added).

The Analysis of the Covenant has this to say about this limitation on Congressional power:

> This guarantee of local self-government is a guarantee which has not been formally made to any territory or even to the Commonwealth of Puerto Rico. It is a limitation on the plenary authority of the United States with respect to the Northern Marianas, and provides an enforceable assurance that the basic relationship between the Northern Marianas and the United States will be governed by the Covenant unless the people of the Northern Marianas agree to a change.
>
> It should be noted that mutual consent provisions prevent not only an attempt by one side to change the language of the Covenant, but also prevent any action or law which would be contrary to a fundamental provision of the Covenant. Thus any attempt by the United States or the

---

[18] This Covenant provision recognizes that congressional power to enact laws applicable to the CNMI derives from the U.S. Constitution.

433

Northern Marianas to circumvent the fundamental aspects of the Covenant would be <u>void</u> and of <u>no effect</u>.

<u>Covenant Analysis</u> at 16-19. (Emphases. added).

 Section 103 of the Covenant is a fundamental provision guaranteeing to the people of the CNMI the right to self-government with respect to internal affairs. The local tax system of the CNMI is an internal affair of the CNMI which is to be governed by the people of the CNMI. Although the Congress has authority to enact laws applicable to the CNMI, it may not do so, without the CNMI's consent, if such enactment would violate any of the fundamental provisions of the Covenant. The federal statute which authorizes the IG to audit the local tax system of the CNMI infringes upon that right to self-government. Thus, it violates Section 103 of the Covenant, a fundamental provision, and is void and of no effect in the CNMI.

## D. <u>Conclusion</u>

 For the above reasons, we conclude that the IG has no authority to audit the local tax system of the CNMI without its consent.

## V.
## <u>TAKING OF CUSTODY AND CONSTRUCTIVE POSSESSION OF TAX RETURNS</u>

 In our order of December 26, 1991, we decided not to analyze this issue because of our rulings on the other issues. Upon further review, we are of the opinion that the trial court need not take constructive custody of the tax return information in order to

434

prevent its disclosure to the IG. The court could simply issue an injunction, enjoining the defendants from releasing such documents. Therefore, there is no need to take constructive custody of the relevant documents.

## VI.

For the above reasons, we **REVERSE** the Superior Court's dismissal of the action and **REMAND** this case to the Superior Court for further proceedings consistent with this opinion. The temporary injunction which we issued pending this appeal expires upon the filing of this opinion. The same applies to our order requiring the Superior Court to take constructive custody of the tax returns.

ENTERED this _21st_ day of _January_, 1993.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
JESUS C. BORJA, Associate Justice