DIANA GRIBBON MOTZ, Circuit Judge,
dissenting: .
With respect, I dissent from the majority’s holding that the district court erred in rejecting Plaintiffs’ equal protection challenge to twin presumptively constitutional redistricting plans. Plaintiffs’ one person, one vote claim rests on their contention that improper “partisanship” rendered the challenged redistricting plans unconstitutional, even though those plans have population deviations of less than 10%[1] If such a claim is justiciable, and it is not clear that it is, the showing necessary to prove such a claim is extremely demanding. The Supreme Court explained only a few weeks ago that such challenges “will succeed only rarely, in unusual cases.” Harris v. Ariz. Indep. Redistricting Comm’n, — U.S. -, 136 S.Ct. 1301, 1307, 194 L.Ed.2d 497 (2016). The challenge here, like that in Harris, is not that “unusual case.” For this reason, I would affirm in its entirety the judgment of the district court rejecting Plaintiffs’ challenges to the redistricting plans.
I.
The Equal Protection Clause requires a State to “make an honest and good faith effort to construct [state legislative] districts ... as nearly of equal population as is practicable.” Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). But, the Reynolds Court itself recognized that, in determining what is “practicable,” the Constitution permits some deviations from perfect population equality when justified by “legitimate considerations incident to the effectuation of a rational state policy.” Id. at 579, 84 S.Ct. 1362; accord Harris, 136 S.Ct. at 1306.
In a long line of eases decided in the wake of Reynolds, the Court has held that districts, like those at issue here, with a “maximum population deviation under 10%” are presumptively constitutional. See, e.g., Brown v. Thomson, 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); accord Harris, 136 S.Ct. at 1307 and cases cited therein. These “minor deviations from mathematical equality do not, by themselves, make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State.” Harris, 136 S.Ct. at 1307 (quoting Gaffney v. Cummings, 412 U.S. 735, 745, 93 S.Ct. 2321, 37 L.Ed.2d *355 298 (1973)) (internal quotation marks omitted).
It was because of “the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality” that the Supreme Court recently reiterated that “attacks on deviations under 10% will succeed only rarely, in unusual cases.” Harris, 136 S.Ct. at 1307. To prevail on such claims, the Harris Court held that a challenger “must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the ‘legitimate considerations’ ” that the Court had identified in previous cases. Id.
In earlier cases the Supreme Court had identified numerous “legitimate considerations” justifying a State’s reapportionment plan. Among them are a State’s valid interests in: maintaining the competitive balance among political parties, Gaffney, 412 U.S. at 752-53, 93 S.Ct. 2321; accord Harris, 136 S.Ct. at 1306, avoiding contests between incumbents as long as incumbents of one party are not favored over those of another, Karcher v. Daggett, 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), and recognizing communities of interest, Evenwel v. Abbott, — U.S. -, 136 S.Ct. 1120, 1124, 194 L.Ed.2d 291 (2016). Indeed, in League of United Latin American Citizens v. Perry, the Supreme Court characterized “avoiding the pairing of incumbents” as a “ ‘neutral’ redistricting standard! ]” and “maintaining communities of interest” as a “traditional districting principle!].” 548 U.S. 399, 412, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (plurality opinion) (“LULAC”); Id. at 433, 126 S.Ct. 2594 (majority opinion).
Thus, notwithstanding Plaintiffs’ apparent belief, the Court has expressly recognized that a redistricting plan can in these ways legitimately take account of political considerations. The Court has never suggested that doing so constitutes reliance on an “illegitimate reapportionment factor.” Harris, 136 S.Ct. at 1307. This approach necessarily follows from the fact that “[p]olitics and political considerations are inseparable from districting and apportionment” and so “districting inevitably has and is intended to have substantial political consequences.” Gaffney, 412 U.S. at 753, 93 S.Ct. 2321.
If those attacking a redistricting plan prove that a State has abused legitimate political considerations by systemically over- or under-populating districts to benefit one party at the expense another, then the challengers may be able to prevail as they did in Larios v. Cox, 300 F.Supp.2d 1320, 1325 (N.D. Ga.), aff'd, 542 U.S. 947, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004) (mem.). Plaintiffs lean heavily on Larios. Their reliance is misplaced.
First, Plaintiffs ignore the very different factual record developed in that case. In Larios, the challenged plan paired in the same district, and thus pitted against each other, 37 of the 74 incumbent Republicans but only 9 of the 105 incumbent Democrats. 300 F.Supp.2d at 1326. In Larios, Georgia legislators admitted before the district court that they had intentionally drawn legislative districts to favor incumbents of one party over those of the other. Id. at 1325. Thus, in Larios, the state legislators conceded that they had not made the “good faith effort” to draw equal districts that Reynolds requires. The record in this case contains no such evidence.
In addition to ignoring the very different evidentiary record in Larios, Plaintiffs turn a blind eye to the Court’s subsequent treatment of that case. In LULAC, the Court explained that Larios “does not give clear guidance” in “addressing political motivation as a justification for an equal- *356 protection violation.” 548 U.S. at 423, 126 S.Ct. 2594 (plurality opinion). And in Harris, the unanimous Supreme Court expressly reserved the question of whether the sort of abusive partisanship at issue in Larios even constitutes “an illegitimate redistricting factor.” Harris, 136 S.Ct. at 1310.[2] Despite Plaintiffs’ protestations to the contrary, the foundations of Larios as persuasive authority rest on shaky ground.
Equally significantly, Plaintiffs take no notice of the holding in Harris that, even if abusive partisanship did constitute an illegitimate factor, those challenging the redistricting plan before it had “not carried their burden.” Id. This holding is particularly significant given that the Harris plaintiffs had made a much stronger evidentiary showing than Plaintiffs do here. For example, the Harris plaintiffs offered direct evidence of a Republican-leaning district made “more competitive” at the request of a Democratic redistricting commissioner by “hyperpacking Republicans into other districts.” Id. at 1309 (internal quotation marks omitted). The redistricting commission in Harris had overpopulated almost all the Republican-leaning districts in the thirty-district plan while underpopulating almost all the Democratic-leaning districts. Id. at 1309-10. Even in the face of this evidence, the district court did not find the redistricting plan unconstitutional — and the Supreme Court agreed. Id. at 1309.
Furthermore, in explaining its rejection of the Harris plaintiffs’ claims, the Supreme Court distinguished Larios in ways that apply with equal force here. The Harris Court held that in Larios, unlike in the case before it (and unlike in the case at hand), “the district court found that those attacking the plan had shown” that no legitimate factors explained the deviations in the plan. Id. at 1310 (emphasis added). The Harris Court explained: “It is appellants’ inability to show” that illegitimate factors predominated “that makes [Larios] inapposite here.” Id. Thus the Court emphasized and re-emphasized that those attacking a presumptively constitutional redistricting plan, like Plaintiffs here, must prove that illegitimate factors predominated.
In sum, even if abusive partisanship claims are justiciable, and do provide the basis for a one person, one vote claim, Plaintiffs had to prove at trial that the State relied on this consideration in redistricting, and that this reliance took precedence over all legitimate considerations, including maintaining political balance among political parties, avoiding contests between incumbents of both parties, and recognizing communities of interest. The State, on the other hand, did not need to offer any justification for its presumptively constitutional redistricting plans. See, e.g., Harris, 136 S.Ct. at 1307.
A fair review of the factual record seems to me to demonstrate that, as in Harris, *357 Plaintiffs here failed to meet their burden and so, as the Supreme Court did in Harris, we should affirm the district court’s rejection of their challenge.[3]
II.
In attempting to meet their substantial burden, Plaintiffs principally rely on the trial testimony of their expert, Dr. Jowei Chen. On the basis of statistical models that he had created, Dr. Chen opined that deviations in the challenged redistricting plans were motivated entirely by a desire to obtain “Republican partisan control over four of the” seven numbered districts and over one of the two lettered super-districts. But, as the district court found, Dr. Chen’s model simply does not prove either conclusion. Dr. Chen’s analysis suffers from two critical flaws.
First, in his model, Dr. Chen pegged the maximum tolerable level of population deviation between districts at 2%. In doing so he held the State to a standard not required by law. Of course, a State must make a “good faith effort” to draw equal districts. Reynolds, 377 U.S. at 577, 84 S.Ct. 1362. But neutral factors may cause population deviations well above 10% without running afoul of the Constitution. See, e.g., Mahan v. Howell, 410 U.S. 315, 328, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). Moreover, Dr. Chen’s arbitrary 2% threshold seems particularly unwarranted in light of the Supreme Court’s repeated characterization of deviations below 10% as “minor” and its admonition that such minor deviations do not “substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation.” White v. Regester, 412 U.S. 755, 764, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).
The second fatal flaw in Dr. Chen’s analysis is his failure to look beyond what he considered to be the only four legitimate or “traditional” districting factors — population equality, intact municipal boundaries, intact precincts, and geographic compactness.[4] Dr. Chen ignored the many apolitical and political factors States may consider during redistricting (like striking a competitive balance among political parties, avoiding contests among incumbents, and recognizing communities of interest), even if pursuing these goals causes minor population deviations.
This is particularly troubling because it is undisputed that two of the legitimate districting factors Dr. Chen failed to consider — incumbency protection and grouping communities of interest — actually motivated the legislature here. The parties stipulated to the accuracy of transcripts of the legislative debate and those transcripts reveal that state legislators altered the district lines in the final version of the *358 School Board redistricting bill to protect two incumbents — one registered Democrat and one registered Republican. Further, the Democratic incumbent, Christine Kushner, testified at trial that “Ms. Priek-ett, who is a registered Republican, had been placed into a Democratic leaning district,” but “was moved out of that district and put into a Republican leaning district, and I [Ms. Kushner] was switched out of District 2 into District 5,” which she admitted was a “more favorable district” for her. Accommodating the legitimate interest in protecting incumbents of both parties had a demonstrable impact on the population deviations across four of the seven numbered districts in the plan. District 1 swung from 2.76% overpopulated to -0.41% underpopulated. District 2 swelled from - 4.19% underpopulated to just -1.05% underpopulated. District 5 dipped from 0.19% overpopulated to -1.53% underpopulated. Finally, District 6 grew from -0.14% underpopulated to 1.6% overpopulated.
Dr. Chen’s model does not in any way account for these population deviations. As a result, Dr. Chen’s view that nothing but improper “partisanship” could explain the population deviations in the twin redistricting plans completely ignores the undisputed impact that the legislative effort to protect the two incumbents had on the plans. In light of that omission, I cannot agree that the district court clearly erred in concluding that Dr. Chen’s testimony did not demonstrate that the legislature deviated from population equality only for the predominant purpose of creating four safe Republican seats out of seven.
Dr. Chen committed the same sort of analytic error in considering the two lettered super-districts. One of the stated purposes for the super-districts was to improve representation for voters in rural areas. Without challenging the State’s consideration of communities of interest generally, Plaintiffs argue that “[t]here is no possible way that [the stated] rationales explain why Super District A needs to be 44,117 people larger than Super District B.” Plaintiffs’ Rep. Br. at 12. According to Dr. Chen, again improper “partisanship” is the only explanation.
And again, Dr. Chen’s model does not support this conclusion. To be sure, the State could have overpopulated District A, an area of the County that has historically voted for Democratic candidates, to increase a Republican candidate’s odds of winning in District B. But the State also could have deviated from population equality to group more urban areas in District A based on their shared interests. This, after all, was the purpose for having the super-districts in the first place, and of course it constitutes a clearly valid State interest. See Evenwel, 136 S.Ct. at 1124. Or the State could have had the dual motivation to accomplish both. Dr. Chen’s model tells us nothing about how grouping together communities of interest motivated the legislature because it a priori excludes any consideration of that legitimate redistricting consideration.
Plaintiffs’ remaining evidence also falls far short of meeting their burden of proving that illegitimate partisan considerations predominated here. Plaintiffs’ expert Anthony Fairfax concluded that the legislature desired to “minimize the Democratic performance” in certain districts by overpopulating the “Democratic performing districts.” That opinion rests on his view that correlation between overpopulation and Democratic performance in the districts in and of itself demonstrates legislative intent — i.e., that the numbers speak for themselves. The district court concluded that they do not.
The record here provides no basis for holding that finding clearly erroneous. Of the four districts assertedly favorable or *359 competitive for Democrats, three are overpopulated. Of the five districts assertedly favorable or competitive for Republicans, only three are underpopulated by more than 1%. One of these three districts, District 2, is underpopulated by just -1.05%. Thus, the asserted correlation between population and Democratic performance is, to say the least, minimal. This minimal correlation limits the strength of any inference that can be drawn. Cf. Harris, 136 S.Ct. at 1309-10 (refusing to infer predominance of illegitimate partisanship over a thirty-district plan where every district underpopulated by more than 1% (nine total) favored Democrats and every district overpopulated by more than 1% (twelve total) favored Republicans). At the very least, the district court did not clearly err when it declined, as the Supreme Court did in Harris in the face of stronger evidence, to make an inference of unconstitutional motivation.
Plaintiffs also offered the lay testimony of members of the state legislature who opposed the redistricting plans. I agree with the majority that the district court erred in categorically rejecting this testimony as irrelevant. But, despite this error, the testimony does not move the needle far on the issue of intent, of those voting to adopt the redistricting plans because, to a person, Plaintiffs’ lay witnesses disclaimed any knowledge of the sponsors’ motivations.[5]
In sum, faced with the heavy burden of proving that assertedly illegitimate “partisanship” constituted the predominant motivation for the presumptively constitutional redistricting plans, Plaintiffs failed to offer any evidence truly probative of legislative intent. Plaintiffs’ experts tendered conclusions that their analyses could not support. Plaintiffs’ remaining evidence proved little. The district court refused to draw Plaintiffs’ preferred inference. In doing so, the court did not clearly err. To the contrary, given the weakness of Plaintiffs’ case, Defendants would have had strong grounds to appeal had the district court ruled otherwise.
I would affirm the judgment of the district court in its entirety.

. In their amended complaint, Plaintiffs also alleged that the plans impermissibly favored ■ rural voters over urban voters. At trial, however, they focused on assertedly improper "partisanship” and produced scant evidence that the State sought to advantage rural over urban voters. Plaintiffs did not even offer evidence as to which districts they considered "urban” or "rural.” Their experts testified that assertedly illegitimate "partisan” motivations, not regional favoritism, predominately motivated the challenged plans. Unsurprisingly, the district court found that Plaintiffs "failed to prove” that either plan "impermis-sibly favors suburban and rural voters over urban voters or substantially dilutes the individual voting strength of Wake County's urban voters.” Raleigh Wake Citizens Ass’n v. Wake Cty. Bd. of Elections, No. 5:15-CV-156-D, 166 F.Supp.3d 553, 616, 2016 WL 1060378, at *40 (E.D.N.C. Feb. 26, 2016). On appeal, Plaintiffs provide no basis on which to disturb that finding.

. Tellingly, the Court has never addressed the alternative holding by the lower court in Lar-ios invalidating the challenged plans on the basis of regional favoritism. That alternative holding has little precedential or persuasive value given, as the Supreme Court has explained, "a summary affirmance is an affir-mance of the judgment only,” not the rationale of the lower court, which "should not be understood as breaking new ground.” Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). And invalidating a redistricting plan because it allegedly favors "rural” or "urban” voters would break new ground. The Supreme Court has never before or after Larios suggested that considering the urban or rural characteristics of a district is an illegitimate apportionment factor. In fact, statements in several cases suggest that these are the quintessential types of communities of interest a State may consider when redistricting. See, e.g., Dusch v. Davis, 387 U.S. 112, 117, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967).

. The district court also rejected Plaintiffs’ one person, one vote claim under the North Carolina Constitution. Because North Carolina courts "generally followf] the analysis of the Supreme Court of the United States” when interpreting the State’s corresponding Equal Protection Clause, I would affirm the district court’s finding that Plaintiffs failed to carry their burden on their state law claims for the same reasons that apply to their federal claims. Blankenship v. Bartlett, 363 N.C. 518, 681 S.E.2d 759, 762 (2009).

. Plaintiffs actually concede the limited reach of Dr. Chen's analysis, noting that his analysis "shows that the partisanship of the enacted districts does not happen when traditional redistricting criteria are followed.” Plaintiffs’ Rep. Br. at 21 (emphasis added). Of course, as See explained above, the Supreme Court has repeatedly recognized numerous legitimate 'redistricting criteria’ other than those that Dr. Chen considers "traditional.” And in LULAC, 548 U.S. at 433, 126 S.Ct. 2594, the Court expressly included "maintaining communities of interest” among "traditional” redistricting criteria.

. More probative are emails from Wake County Republican Chairwoman Donna Williams to Republican members of the state legislature and School Board. Williams expressed concern that the proposed map would not be sufficiently favorable to Republicans to permit them to "take 5 of the 9 seats.” However, the record does not contain requests for information or responses from State officials or any indication that Ms. Williams’ lobbying efforts had any effect on the legislation.